2012 OK 97

**Lori COLCLASURE, Now Dean, Petitioner/Appellant,**

v.

**Kent COLCLASURE, Respondent/Appellee.**

No. 109,218.

Supreme Court of Oklahoma.

Nov. 20, 2012.

Rehearing Denied Feb. 4, 2013.

---

George H. Brown, Oklahoma City, Oklahoma, for Petitioner/Appellant.

John E. Barbush, Oklahoma City, Oklahoma, for Respondent/Appellee.

KAUGER, J.:

¶ 1 The only issue presented on appeal is whether the trial court erred in its valuation of the marital business. We reverse and remand to the trial court for a valuation of the parties' marital business which includes

any loss in its value due to husband's competing business. Such a determination must include its value as of the date that the husband purchased a share of the business, as well as any offset to the valuation of husband's share of the business because he received money from the business during the pendency of the divorce.

## FACTS

¶2 The appellant, Lori Colclasure Dean (wife), was, from January 1, 1999, until January 1, 2004, the sole owner and operator of Arrow Hardwood Floors, LLC, (Arrow)[1] Arrow was an Oklahoma Limited Liability Company under the Articles of Organization filed with the Oklahoma Secretary of State on April 2, 1998. On January 1, 2004, Dean and appellee Kent Colclasure (husband), executed a document entitled Unit Purchase Agreement for Dean's sale of forty-nine percent (49%) of Arrow Hardwood Floors to her then fiancée, Colclasure. The purchase price under the agreement was five-thousand dollars ($5,000).[2] No valuation of the company was made at the time of the Unit Purchase

Agreement. However, Colclasure's expert indicated that the Gross Receipts for the calendar year 2003, were $635,549 and that the Gross Profits totaled $126,431.[3]

¶3 The parties were married on October 1, 2004. On December 19, 2006, they executed a document entitled Operating Agreement for Arrow Hardwood Floors, LLC. The agreement was presented to them by an accountant and business consultant who worked for Arrow and was a friend of the husband.[4] The template for the document was prepared by a lawyer and finalized by the accountant.[5] The wife was described in the Agreement as the manager of Arrow and she signed the document as such. The husband and wife both signed as members. The Certificate of Agreed Value contained in the agreement was blank, as was the addendum setting forth their initial capital contributions and the percentages of ownership. The agreement contained two pertinent clauses which should be noted in their entirety, clause 6.08,[6] concerning outside activities of members and clause 12.01,[7] disqualification of a member.

1. Testimony of Lori Colclasure, District Court of Oklahoma County, September 28, 2010.

2. Petitioner's exhibit 32, District Court of Oklahoma County, September 28, 2010. Petitioner's counsel stated in a letter to Respondent's counsel, dated April 5, 2010, and filed in the FD 2009–6534, District Court of Oklahoma County, that Colclasure did not pay the requisite payment for his share of Arrow.

3. Respondent's exhibit 79, District Court of Oklahoma County, September 27, 2010.

4. Testimony of Lori Colclasure, District Court of Oklahoma County, September 28, 2010.

5. Testimony of Rob Shaff, District Court of Oklahoma County, September 28, 2010.

6. Operating Agreement of Arrow Hardwood Floors, clause 6.08 provides, in pertinent part:
 *Outside Activities.* Each Member ... may have business interest and engage in business activities in addition to those relating to the Company, including, without limitation, business interest and activities that are in direct competition with the Company ... and no provision of this Agreement shall be deemed to prohibit such Member ... from having such competing business interests or conducting such competitive businesses or activities. Neither the Company nor the other Members shall

have the right by virtue of this Agreement or the relationship contemplated herein in any business ventures of such Member or such Member's Affiliates.

7. Operating Agreement of Arrow Hardwood Floors, clause 12.01 provides, in pertinent part:
 *Disqualification of Member.* Upon the death, filing of a petition for divorce, incapacity, resignation, bankruptcy or disassociation of a Member (such Member being hereafter sometimes referred to as a 'Disqualified Member'), ... the Company shall dissolve and its affairs shall be wound up. The Company shall thereafter conduct only activities necessary to wind up its affairs, unless within sixty (60) days after the occurrence of an Event of Dissolution, the remaining Members owning a majority of the Percentage Interests ... agree to continue the company. If an election to continue the Company is made[,] ... [t]he remaining members may elect, within sixty (60) days of electing to continue the Company, to purchase the Disqualified Members Percentage Interests. The purchase price to be paid by the remaining Members for the Disqualified Member's Percentage Interest (the *"Purchase Price"*) shall be the Agreed Value ... multiplied by the Disqualified Member's Percentage Interest. If no agreed value had been determined in accordance with this Section 12.01, then the Purchase Price shall be the Appraised Value ...

¶ 4 The wife and husband each worked at Arrow. The husband worked as the sales representative and the wife worked as the manager/bookkeeper. The petition for divorce was filed by the wife on December 28, 2009, and included an application for a temporary order. An agreed temporary order was filed on February 9, 2010. The agreement provided that the wife was to continue as the accountant, although the Agreement does not describe her as such, and that the husband was to work for the company as the sales representative. The parties were prohibited from incurring any corporate indebtedness without written permission from the other party or order of the court. The order provided for monthly distributions to be made to both parties.

¶ 5 By April of 2010, the relationship between the parties had deteriorated further. On or about April 1, 2010, at the Arrow premises, during a dispute over husband's charges of entertainment and other purchases to the company accounts, the husband shoved the wife, causing her to fall. As a result of the fall, the wife was treated for contusions and bruising to her tailbone and she filed for a victim's protective order. She terminated the husband from his role as the company's sales representative on April 5, 2010.

¶ 6 The husband started his own flooring company in direct competition with Arrow and, pursuant to the agreed temporary order, used the Arrow showroom as his office. The wife alleged that the husband used Arrow order books, samples, mobile telephones, and transport in this competing business. She also alleged that he stole Arrow's customers and undercut Arrow on bids. On June 30, 2010, the trial court issued a minute order setting forth the parties' agreed use of the Arrow showroom. The order provided that the husband was not to use the warehouse; the telephone; say he was with Arrow or access Arrow's current bids; neither husband nor wife was to interfere with each other's business or customers. The husband was still receiving disbursements from Arrow.

¶ 7 The case was tried during the last week of September of 2010; the Decree of Dissolution of Marriage was filed on January 28, 2011. The husband was awarded $235,200.00 in property division alimony for his forty-nine (49) percent interest in Arrow. This amount is forty-seven times the amount of his initial investment in Arrow, just five years before the divorce was filed.

¶ 8 The valuation of the business was not conducted pursuant to the terms of the Agreement. Both sides presented expert valuation testimony during the divorce trial. The valuations were significantly different. The procedures in the Agreement providing for a third tie-breaking evaluation were not used.[8]

¶ 9 The wife's expert, Kenneth W. Klingenberg (Klingenberg), was a certified public accountant and a member of the Oklahoma Bar. His valuation was made using an income

multiplied by the Disqualified Member's Percentage Interest. . . .
(C) For purposes of this Section, 12.01, *"Appraised Value"* shall mean the appraised value determined as of the last day of the month immediately prior to the month in which the Event of Dissolution occurred (the "Appraisal Date") in accordance with this section 12.01(c). The purchase price shall be determined as of the Appraisal Date by an independent appraiser mutually agreed to by the Disqualified Member and the remaining Members. In the event the Disqualified Member and the remaining Members are unable to agree upon the independent appraiser within twenty (20) days after the Appraisal Date, the Disqualified Member shall select an independent appraiser and the remaining Members shall select an independent appraiser within thirty (30) days after the Appraisal Date. The Purchase Price shall be determined by averaging the amount determined by the two (2) independent appraisers. In the event either of the appraised values is greater or lesser than ten percent (10%) of the average appraised value, then the two (2) independent appraisers shall select a third appraiser, and the Purchase Price shall be the average of the two (2) appraisals which are closest in amount. In the event the Disqualified Member or the remaining Members fail to select an appraiser within the thirty (30) day period, the appraiser selected within such time period shall alone determine the purchase price. Each appraiser shall submit its appraisal in writing ... within thirty (30) days from the date the appraiser is engaged. . . .

8. See footnote 6 for the terms of the Operating Agreement for valuation of the company if a member is bought out.

method and an excess earnings approach, with a December 31, 2009, valuation date. He testified that he used the end of the business year valuation date because the records were better and because the divorce was filed on December 28, 2009. His valuation reduced the total value of Arrow because of diversion of $298,085.58 in business by the husband. Klingenberg calculated, using Dean's figures, that the loss in the value of Arrow because of diverted business was $104,330.[9] His buy/sell valuation of Arrow was $216,315. He included the diverted business in the valuation because, although it occurred after the valuation date, a subsequent event, it was both known and knowable and thus should have been used in the valuation.

¶ 10 The husband's expert, Ralph E. Blodgett (Blodgett), was a certified public accountant, a member of the Oklahoma Bar and a Certified Valuation Analyst. He used the capitalized cash flow method of valuation with a valuation date of November 30, 2009, which he stated was required by the agreement. He considered the filing of the divorce to be the Event of Dissolution. He calculated Arrow's value at $480,000, and the husband's interest at $235,200.[10] He testified that the diversion of business by husband in 2010, was not known or knowable as of the date of valuation and thus could not be used to value the business.[11] This method precludes any reduction in the value of the business because of the husband's competing business. There was no evaluation of the enhanced benefits the husband received. The trial court valued the business at $480,000. The husband was awarded property division alimony of $235,200.

¶ 11 The Court of Civil Appeals affirmed the value which the trial court placed on Arrow and the resulting amount of property division awarded husband for his portion of Arrow. We granted certiorari on May 14, 2012, to consider the disputed valuation of Arrow in the property division.

**¶ 12 THE TRIAL COURT ERRED IN FAILING TO CONSIDER A REDUCTION IN VALUATION OF THE MARITAL BUSINESS BECAUSE OF HUSBAND'S BUSINESS COMPETITION.**

██ ¶ 13 The wife argues that the husband's direct competition with Arrow caused a decrease in the value of the business which should have been reflected in the trial court's determination of Arrow's valuation and thus the amount of the husband's property division alimony. She argues that there was "double-dipping" by the husband because he had income from business diverted from Arrow and income from Arrow, with no adjustment whatsoever for the decline in Arrow's value because of this.

¶ 14 The husband argues that, under the Agreement, the date of valuation was unalterably November 30, 2009. He also argues that, because his competition against Arrow took place after November 30, 2009, it cannot be used to alter the value of Arrow on the valuation date. He contends that, because the Agreement permitted his competition, he cannot be penalized for his actions by a reduction of his property award.

¶ 15 At the outset we note that the agreement was a buyout agreement and failing a buyout, an agreement for the dissolution of a business, which neither party followed. They did not obtain appraisers by the time they were required to do so under the contract. They did not follow the contract requirement that, if the appraisers did not agree, they would hire a third appraiser and follow an averaging valuation. Had the parties followed their own agreement, this matter could have been settled by the parties without the need to involve the trial court in the valuation process.

 ¶ 16 A divorce suit is one of equitable cognizance in which the trial court has discretionary power to divide the marital es-

9. Testimony of Kenneth Klingenberg, District Court of Oklahoma County, September 27, 2010.

10. Testimony of Ralph E. Blodgett, District Court of Oklahoma County, September 27, 2010.

11. Testimony of Ralph E. Blodgett, District Court of Oklahoma County, September 27, 2010.

tate.[12] The trial court must follow the provisions of 43 O.S. 2006 § 121 which require a fair and equitable division of property acquired during the marriage by the joint industry of the husband and wife.[13] The trial court has wide latitude in determining what part of jointly-acquired property shall be awarded to each party.[14] However, a marital estate need not necessarily be equally divided to be an equitable division because the words just and reasonable in § 121 are not synonymous with equal.[15] An appellate court will not disturb the trial court's property division absent a finding of abuse of discretion or a finding that the decision is clearly contrary to the weight of the evidence.[16]

■■■■ ¶ 17 Jointly-acquired property is that which is accumulated by the joint industry of the spouses during the marriage.[17] A marital estate need not be equally divided in order for there to be equitable division, as the wife converted what was, prior to the marriage, her separate property, into a marital business by permitting the husband to "buy" an interest in the business for $5,000.00. Consequently, Arrow is now considered marital property subject to division in the divorce. However, a mere valuation of Arrow as of a date certain, November 30, 2009, or December 28, 2009, does not determine what portion of the value of the business was the result of the husband's efforts, the wife's efforts, or their joint efforts.

■■■■ ¶ 18 The trial court was not bound by the valuation date set forth in the Agreement when placing a value on the business for purposes of property division. Pursuant to *Thielenhaus v. Thielenhaus*, 1995 OK 5, 890 P.2d 925, the trial court is vested with discretion in determining the cut-off time for the valuation of marital assets, and the date of valuation is to be determined by the trial court after due consideration of all the circumstances of the case.[18] The trial court is obligated by statute to ensure a fair and just division of the marital assets, and the only mechanism permitted by statute to override that obligation is an antenuptial agreement between the parties. The Agreement at issue in this case was not entered into until after the parties married.[19] The trial court

12. *Jackson v. Jackson*, 1999 OK 99, ¶ 7, 995 P.2d 1109; *Larman v. Larman*, 1999 OK 83, ¶ 17, 991 P.2d 536; *Teel v. Teel*, 1988 OK 151, ¶ 7, 766 P.2d 994, 998; *Johnson v. Johnson*, 1983 OK 117, 674 P.2d 539, 544; *Carpenter v. Carpenter*, 1983 OK 2, ¶ 24, 657 P.2d 646, 651; *Peters v. Peters*, 1975 OK 114, ¶ 9, 539 P.2d 26, 27; *McCoy v. McCoy*, 1967 OK 86, ¶ 8, 429 P.2d 999; *West v. West*, 1954 OK 84, ¶ 6, 268 P.2d 250, 253.

13. Title 43 O.S. Supp.2006 § 121, in effect as of the date of the divorce, provides in pertinent part:

... The court shall enter its decree confirming in each spouse the property owned by him or her before marriage and the undisposed-of property acquired after marriage by him or her in his or her own right. Either spouse may be allowed such alimony out of real and personal property of the other as the court shall think reasonable, having due regard to the value of such property at the time of the divorce. Alimony may be allowed from real or personal property, or both, or in the form of money judgment, payable either in gross or in installments, as the court may deem just and equitable. As to such property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall, subject to a valid antenuptial contract in writing, make such division between the parties as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to be paid such sum as may be just and proper to effect a fair and just division thereof....

14. *Teel v. Teel*, see note 12, supra. See also *Phillips v. Phillips*, 1976 OK 165, ¶ 9, 556 P.2d 607, 610.

15. *Gray v. Gray*, 1996 OK 84, ¶ 15, 922 P.2d 615.

16. *Teel v. Teel*, see note 12, supra; *Kiddie v. Kiddie*, 1977 OK 69, ¶ 3, 563 P.2d 139, 140–41.

17. *Thielenhaus v. Thielenhaus*, 1995 OK 5, ¶ 9, 890 P.2d 925, 930.

18. *Thielenhaus v. Thielenhaus*, note 17, supra at ¶ 11.

19. Title 43 O.S. Supp.2006, in effect at the date of the divorce, provides in pertinent part:

... As to such property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court **shall, subject to a valid antenuptial contract in writing**, make such division between the parties as may appear just and reasonable,

wrongly held that the parties' Agreement, which they did not follow, required it to reach an unfair result in distributing the company's value between them.

■■ ¶ 19 The Agreement and the Unit Purchase Agreement provide no valuation of Arrow. The wife permitted the husband to buy into her existing business for what appears to be a nominal purchase price. Klingenberg's valuation stated that the total income for Arrow in 2003 was $126,431; the gross receipts were $635,549. The husband paid $5,000 for his forty-nine percent of Arrow and received forty-seven times that amount in property division alimony. To be equitable, any determination of a value for the marital business must take into account the value of the business when Colclasure bought his forty-nine percent share, and the proportionate increase in value due to the joint industry of the husband and wife.

¶ 20 We note that in *Lemons v. Lemons*, 2006 OK CIV APP 5, 128 P.3d 1113, the court held that as a general rule the trial court should not consider how much either party contributed to the purchase of jointly acquired property, because a gift from one party to the other is presumed. The *Lemons* court relied on this Court's decision in *Shackelton v. Sherrard*, 1963 OK 193, 385 P.2d 898. In *Shackelton*, we held that the interests of married joint tenants are presumed to be equal, because one of the characteristics of

joint tenancy is the equality of the interest.[20] Here, the marital property, like that in *Lemons*, is not held by joint tenancy and is not subject to the presumption of equality of interest. To the extent that *Lemons* contradicts this Court's holding in *Shackelton*, it is overruled.

■■ ¶ 21 This Court has also recognized the concept of double-dipping as it relates to accounting for disbursements from marital property during the pendency of a divorce.[21] In *Mocnik v. Mocnik*, 1992 OK 99, 838 P.2d 500, the wife removed $7,000 from joint funds at the time of the marital separation. To avoid double-dipping, the $7,000 was included as a portion of the wife's property settlement. This action was not altered on the appeal. In this cause, the trial court failed to address payments to the husband from Arrow while the divorce was pending or income to the husband and wife. These are examples of double-dipping and should have been addressed in the alimony in lieu of property settlement award to the husband.

¶ 22 The trial court's property division in this case is clearly contrary to the weight of the evidence. The husband was a named co-owner of Arrow while intentionally competing against Arrow. He was operating a competing business in the Arrow showroom. He used Arrow equipment in the competing business. It was not ordinary competition, but competition from an individual familiar

---

by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to be paid such sum as may be just and proper to effect a fair and just division thereof .... [emphasis added].

**20.** *Shackelton v. Sherrard*, 1963 OK 193, ¶ 9–10, 385 P.2d 898. We held that:

Under such rule it is ordinarily immaterial how much money the wife or husband has actually contributed to the purchase of the property involved because a gift from one to the other is presumed. Absent any fraud or special agreement, where the wife or husband knowingly agrees and consents to the conveyance being made to themselves as **joint tenants,** either is estopped to deny the tenancy of the other. [emphasis added].

**21.** *Mocnik v. Mocnik*, 1992 OK 99, 838 P.2d 500. See also *Gray v. Gray*, 1996 OK 84, 922 P.2d 615, which provides:

The trial court has wide latitude in determining what part of jointly-acquired property shall be awarded to each party. *Teel v. Teel*, 766 P.2d 994, 998 (Okla.1988); *Phillips v. Phillips*, 556 P.2d 607, 610 (Okla.1976). However, all property acquired during marriage by the joint industry of the husband and wife must be fairly and equitably divided by the trial court. 43 O.S. Supp.1992 § 121; *Thielenhaus*, 890 P.2d at 930. This is true regardless of how title to the property is held. 43 O.S. Supp.1992 § 121; *Manhart v. Manhart*, 725 P.2d 1234, 1240 (Okla.1986). The marital estate need not necessarily be equally divided to be an equitable division because the words "just" and "reasonable" in § 121 are not synonymous with "equal." *Teel*, 766 P.2d at 997 n. 6. An appellate court will not disturb the trial court's property division absent a finding of abuse of discretion or a finding that the decision is clearly contrary to the weight of the evidence. *Id.* at 998; *Kiddie v. Kiddie*, 563 P.2d 139, 140–41 (Okla.1977).

with the inner workings of the business and its client base. The trial court should have considered the exact loss to the value of Arrow because of the husband's competition and adjusted the husband's share of the property division accordingly.

¶ 23 The husband's argument that the agreement permitted him to operate a competing business is not relevant to the valuation issue. The question is not whether he may be sued for breach of fiduciary duty, but rather whether his actions lowered Arrow's value so that he received more money in the property settlement than he should have received. The husband's competition was permitted under the contract. It is not an issue of permission, but of benefit to one party at the expense of another party.

¶ 24 The husband also argues that the valuation date of November 30, 2009, cannot be altered and that any offset in Arrow's value because of his competition is not a factor because it took place in 2010, after the valuation date. The Agreement set out procedures for what may be called a minority owner buy-out if that member becomes disqualified as a member because of divorce. The Agreement provided:

> For purposes of this Section, 12.01, "*Appraised Value*" shall mean the appraised value determined as of the last day of the month immediately prior to the month in which the Event of Dissolution occurred (the "Appraisal Date") in accordance with this section 12.01(c). The purchase price shall be determined as of the Appraisal Date by an independent appraiser mutually agreed to by the Disqualified Member and the remaining Members. In the event the Disqualified Member and the remaining Members are unable to agree upon the independent appraiser within twenty (20) days after the Appraisal Date, the Disqualified Member shall select an independent appraiser and the remaining Members shall select an independent appraiser within thirty (30) days after the Appraisal Date. The Purchase Price shall be determined by averaging the amount determined by the two (2) independent apprais-

ers. In the event either of the appraised values is greater or lesser than ten percent (10%) of the average appraised value, then the two (2) independent appraisers shall select a third appraiser, .and the Purchase Price shall be the average of the two (2) appraisals which are closest in amount. In the event the Disqualified Member or the remaining Members fail to select an appraiser within the thirty (30) day period, the appraiser selected within such time period shall alone determine the purchase price. Each appraiser shall submit its appraisal in writing ... within thirty (30) days from the date the appraiser is engaged. . . .

¶ 25 The valuation and buy-out provisions of the Agreement were not followed. This is not the rewriting of an unambiguous contract. The parties wanted to cherry pick the contract for the terms most favorable to each of them. The entire contract was followed by neither party. There is no provision in the Agreement which provides that the members will try and continue the business together if a divorce is filed. The Agreement provides for a reasonable and timely buy-out of the disqualified member. In this case, the court's equity power in determining the property division is sufficient to permit it to consider a property valuation which does not require a November 30, 2009, valuation date.

## CONCLUSION

¶ 26 The property settlement in a divorce case is an equitable matter and will not be overturned unless it is clearly against the weight of the evidence.[22] The evidence shows that the trial court made no determination of the actual increase in the value of the business from the date husband became a part of the business. There was no determination of how much double-dipping took place when the husband received money from the business which was not deducted from the property settlement. There was no determination concerning how much husband's

---

**22.** *Teel v. Teel,* see note 12, supra; *Phillips v. Phillips,* see note 14, supra; *Thielenhaus v. Thiel-* enhaus, see note 17, supra; *Kiddie v. Kiddie,* see note 16, supra.

direct, insider competition against Arrow devalued it.

¶ 27 There is a basic evidentiary question as to the exact amount of business the husband diverted. The record does not give a balanced picture of how this was calculated, but rather relies on the wife's expert, who in turn relies on the wife's calculations. There was no determination of the value of the business at the time husband bought his share. These questions must all be covered by the trial court the second time around. The evidence, taken as a whole, shows that the valuation of Arrow, and thus the husband's portion of the property settlement, was against the clear weight of the evidence.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED; TRIAL COURT REVERSED AND REMANDED.**

TAYLOR, C.J., COLBERT, V.C.J., KAUGER, EDMONDSON, REIF, and GURICH, JJ., concur.

WATT, WINCHESTER, and COMBS, JJ., dissent.

WATT, J., with whom WINCHESTER, J. and COMBS, J. join, dissenting:

¶ 1 The petitioner/appellant, Lori Colclasure (wife), **sold** a forty-nine percent interest in her flooring business to the respondent/appellee, Kent Colclasure (husband), **before the marriage.** The majority remands the instant cause for the trial court to re-evaluate the worth of the business, including any loss in its value due to the husband having opened a competing business and to the draws he took from the business after divorce proceedings were instituted. It also directs the trial court to value the business as of the date of the husband's purchase along with any money he received as an owner of the business. In so doing, the majority invades the province of the trial court while re-writing the parties' contract for what appears to be the single purpose of increasing the wife's settlement award. This I will not do. Therefore, I dissent.

**¶ 2 a) No abuse of discretion occurred in the property division.**

¶ 3 The majority pays lip service to the well-established rule that the trial court has considerable discretion in making decisions regarding the division of property upon divorce. The opinion provides in pertinent part at ¶ 15:

> ... The trial court has wide latitude in determining what part of jointly acquired property shall be awarded to each party. . . . An appellate court will not disturb the trial court's property division absent a finding of abuse of discretion or a finding that the decision is clearly contrary to the weight of the evidence. . . . [Footnotes omitted.]

Nevertheless, it goes on to find abuse where none exists. In order to do so, the majority abandons the rule it claims for guidance and the standard for upholding a decision made by the one person in the judicial chain with the opportunity to hear the evidence, observe the parties and the witnesses, and form an independent conclusion guided by application of legal standards to the facts presented.

¶ 4 An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law,[1] when there is no rational basis in evidence for the ruling,[2] or if it acts arbitrarily.[3] None of these conditions exist in this cause.

¶ 5 There are valid reasons upon which the trial court may have determined the husband's valuation of the business interest to have been more accurate than that of the wife's. First, the wife's expert recognized that there was an error of approximately $144,000.00 in his calculations.[4] Second, the

---

1. *Wells Fargo Bank, N.A. v. Heath,* 2012 OK 54, ¶ 8, 280 P.3d 328.

2. *United States Bank Nat'l Ass'n v. Baber,* 2012 OK 55, ¶ 4, 280 P.3d 956; *Fent v. Oklahoma Natural Gas Co.,* 2001 OK 35, ¶ 12, 27 P.3d 477.

3. *Head v. McCracken,* 2004 OK 84, ¶ 2, 102 P.3d 670; *Mooney v. Mooney,* 2003 OK 51, ¶ 50, 70 P.3d 872.

4. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at p. 64:

appraiser acknowledged that there was a method in the parties' agreement for the determination of a date to utilize in determining the valuation of the business, **which he did not utilize.**[5] Third, the report itself had conflicting dates upon which different capitalization rates [6] were utilized, which may have indicated that the wife's appraiser was "cherry picking" information from reports of different dates and utilizing the information most favorable to his client. This is demonstrated by the expert's own testimony where he admits completing an initial report in which he utilized a capitalization rate of 36.96% and then applied a rate of 47.05% in the report submitted at trial.[7] It is also apparent in the selection of a number for the corporation's gross profits.[8] Third, the same witness admitted to using the highest tax rate available to a corporation in his valuation estimates rather than the tax rate applicable to the flooring business.[9] Fourth, the wife's expert agreed that his original valuation of the company was some $300,000.00 lower than the final draft and that if he had not included estimated values for diversion of income and had not utilized the inflated capitalization rate, his estimate would have been comparable to the estimate made by the husband's appraiser.[10] Finally, the wife's ex-

> "... Q All right. Looking at this page, do you see where you have the—the number $357,386, correct?
> A Absolutely, yes, sir.
> Q Okay. I'm going to hand you [sic] calculator. Will you, please, do the math where you have deducted out those other expenses and tell me if your report give [sic] us the correct number?
> A Well, I'm embarrassed to tell you, it does not come up with the number.
> THE COURT: Okay, I'll bite. What number does it come out to?
> MR. KLINGENBERG: 207,588...."

5. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at pp. 65–66:

> "... Q Okay. But you saw in the operating agreement, in Section 12, where the parties agreed on how the company would be valued, as far as how the appraisal date would be determined for using for an evaluation, if there was a need to evaluate the company; is that correct?
> A As of the appraisal date, yes....
> Q So the parties had agreed previously, before we got any experts involved, on what date the company's financials and documents would be looked at to do an evaluation; is that correct?
> A Under the operating agreement there is a method, yes...."

6. "Capitalization rate" is that percentage which will provide for recapture or amortization of value of investment in the improvements, plus a reasonable and proper rate of return to the investor, whether income to be capitalized is calculated before or after deduction of debt service. *Sill Corp. v. United States*, 343 F.2d 411 (10th Cir. 1965), *cert. denied*, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81 (1965).

7. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at:

pp. 66–67: "Q Looking at this page that we've been referring to or your report, it's got—why does it say, 31–Dec–08 at the top of those numbers?
A Well, because I had originally prepared an evaluation prior, and when we changed it that should have changed to December 31, '09...."
p. 74: "... Q It is quite common when you prepare evaluations of companies to see capitalization rates computed at 47.05 percent, in your experience?
A ... But this is a relatively high cap rate, I'm not denying that it is...."
p. 78: "... Q And tell the Judge what your pretax, current year capitalization rate was when you prepared your first valuation of the company?
A 36.96 percent...."

8. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at p. 78:

> "... Q And you used the valuation date of December 31st, 2008, in this report, correct?
> A That is correct.
> Q Now, Arrow Hardwood Floors [sic] gross profit for 2009 was actually a bit higher than 2008, wasn't it?
> A I think you're right...."

9. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at p. 74:

> "... Q Okay. Now, speaking of the taxes, isn't it true, sir, that you used the highest tax rate of 35 percent, which is the same rate used for C corporations?
> A That's correct.
> Q And that is an S corporation, correct?
> A That's correct...."

10. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at pp. 84–85:

> "... Q Okay. What on the 2009 tax return changed your valuation of this company by, approximately, $300,000, sir?

pert admitted that his valuation was not computed in accordance with generally accepted accounting principals although it was done pursuant to National Association of Certified Valuation Analyst Professional Standards.[11]

¶ 6 The majority recognizes that the trial court had before it evidence that would support the trial court's property division. It acknowledges that the valuation was made by an individual who is a member of the Oklahoma Bar Association and a Certified Valuation Analyst. It is of no import that there was also evidence from another source which would support a different division of the property interests. There being no evidence sufficient to show the trial court abused its discretion as to the property division, its ruling should be affirmed.

¶ 7 b) **To reach the result recommended by the majority, it must rewrite an unambiguous contract. An action prohibited by Oklahoma jurisprudence.**

¶ 8 The Operating Agreement (agreement) was signed by both the husband and the wife as "members." It provides in pertinent part that each member may engage in business, **without limitation,** in business interests and activities that are in **direct competition with the Company.** The agreement goes on to state, in mandatory language,[12] that no provision of the contract **shall be deemed to prohibit a member from having a competing business or engaging in competitive activities.**[13]

¶ 9 Upon divorce, the agreement provides that the company shall dissolve and its affairs be wound up with the right to purchase being given to any remaining member. The same contract has a formula for determining a purchase price which utilizes an appraised value where no agreed value can be reached. Again, mandatory language provides that the "appraised value" **shall mean the value determined as of the last day of the month immediately prior to the month in which the event of dissolution occurs, here the appraisal date is undoubtedly the last day of the month prior to the month in which the petition for divorce was filed.** In this case, the "event of dissolution" was the wife's filing for divorce on December 28, 2009. Clearly, **the agreement, which both parties signed, intended the date of valuation to be November 30, 2009,** not some date thereafter which might take into effect changes in condition of the operation of the flooring business.[14]

¶ 10 Intent at execution controls the meaning of written contractual terms[15] and the extent of the obligation is defined by the promise given. Contract language is accorded its plain and ordinary meaning absent a term intended to carry a specific technical meaning.[16] Where terms are defined the

---

... A I don't know that it was specifically anything on the '09 tax return that changed the value....
Q Okay. Would you agree with me, sir, that if we take out this stuff about a deduction for diversion of income and used this cap rate that you originally determined for the valuation of the company, you and Mr. Blodget's final valuation numbers are very close?
A You know I haven't run those numbers but I would—certainly, that would narrow the gap...."

11. Transcript of proceedings, September 27, 2010, Kenneth W. Klingenberg testifying in pertinent part at p. 86:
"... Q Can you tell this Court this your final valuation is computed in accordance with generally accepted accounting principals?
A It never was intended to be, and it was not, and it will not be...."

12. The term "may" is ordinarily construed as permissive while "shall" is commonly considered to be mandatory. *MLC Mort. Corp. v. Sun Amer-ica Mort. Co.,* 2009 OK 37, fn. 17, 212 P.3d 1199; *Osprey LLC v. Kelly–Moore Paint Co., Inc.,* 1999 OK 50, ¶ 14, 984 P.2d 194; *Shea v. Shea,* 1975 OK 90, ¶ 10, 537 P.2d 417.

13. Operating Agreement of Arrow Hardwood Floors, clause 6.08.

14. Operating Agreement of Arrow Hardwood Floors, clause 12.01.

15. Title 15 O.S.2011 § 152; *Oxley v. General Atlantic Resources, Inc.,* 1997 OK 46, ¶ 14, 936 P.2d 943.

16. Title 15 O.S.2011 § 154; *JPMorgan Chase Bank v. Specialty Restaurants, Inc.,* 2010 OK 65, 243 P.3d 8; *BP America, Inc. v. State Auto Property & Cas. Ins. Co.,* 2005 OK 65, ¶ 6, 148 P.3d 832.

parties are bound by those definitions.[17] Extrinsic evidence need not be introduced when the language is clear and explicit.[18] If the contract is complete in itself and, viewed in its entirety unambiguous, its language is the only legitimate evidence of intent.[19] The courts decide, as a matter of law, whether a contract provision is ambiguous.[20] Absent illegality, **the parties are free to bargain as they see fit, and this Court will neither make a new contract nor rewrite existing terms.**[21]

¶ 11 There is nothing ambiguous about the agreement entered by the parties. It clearly and unambiguously allows direct competition and provides the formula by which the value of the company is to be determined. The wife made a bad business decision when she sold her then fiancée forty-nine percent (49%) of her flooring company for $5,000.00. The husband did not "double dip" by continuing to receive his share of the benefits arising from the interest he held in the wife's flooring business and nothing prohibited his entering into competition with the original flooring enterprise. Rather, such competition was expressly considered in the agreement itself.

¶ 12 There was no abuse of discretion in acknowledging the terms of the contract or in holding the parties to those strictures. The abuse occurs when the majority steps in to make a property division that "looks fair" but which is not what the parties clearly intended nor is it that for which they negotiated.

### CONCLUSION

¶ 13 A review of the property division for an abuse of discretion does not allow this Court to substitute its judgment for that of the trial court. Because no such abuse oc-

curred, the property division award should be upheld. I would do so. Therefore, I dissent.

**17.** See, *Maule v. Independent School Dist. No. 9 of Tulsa County*, 1985 OK 110, ¶ 7, 714 P.2d 198

**18.** *Lum v. Lee Way Motor Freight, Inc.*, 1987 OK 112, ¶ 16, 757 P.2d 810; *Rucker v. Republic Supply Co.*, 1966 OK 118, ¶ 9, 415 P.2d 951.

**19.** *Founders Bank & Trust v. Upsher*, 1992 OK 35, ¶ 19, 830 P.2d 1355; *Mercury Inv. Co. v. F.W. Woolworth Co.*, 1985 OK 38, ¶ 9, 706 P.2d 523.

**20.** *Oklahoma Oncology & Hematology v. United States Oncology, Inc.*, 2007 OK 12, ¶ 27, 160 P.3d 936; *Whitehorse v. Johnson*, 2007 OK 11, ¶ 14, 156 P.3d 41; *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12, 63 P.3d 541.

**21.** *JPMorgan Chase Bank v. Specialty Restaurants, Inc.*, see note 17, supra; *Oxley v. General Atlantic Resources, Inc.*, see note 16, supra; *Bonner v. Oklahoma Rock Corp.*, 1993 OK 131, ¶ 5, 863 P.2d 1176.