OSCN Found Document:BALLINGER v. BALLINGER

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 BALLINGER v. BALLINGER
2014 OK CIV APP 92
Case Number: 111372
Decided: 10/10/2014
Mandate Issued: 11/17/2014
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2014 OK CIV APP 92, __ P.3d __

 

IN RE THE MARRIAGE OF: LAURA A. BALLINGER, 
Petitioner/Appellee,
v.
GLENN M. BALLINGER, Respondent/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, 
OKLAHOMA
HONORABLE HOWARD R. HARALSON, TRIAL JUDGE

AFFIRMED IN PART, REVERSED IN PART, AND 
REMANDED WITH DIRECTIONS

Jon L. Hester, Scott A. Hester, HESTER SCHEM HESTER & DEASON, Edmond, 
Oklahoma, for Petitioner/Appellee
William E. Liebel, James T. Gorton, LAW 
OFFICES OF WILLIAM E. LIEBEL, Oklahoma City, Oklahoma, for 
Respondent/Appellant


DEBORAH B. BARNES, CHIEF JUDGE:
¶1 Respondent/Appellant Glenn M. Ballinger (Husband) appeals a divorce decree 
filed in December 2012. Petitioner/Appellee Laura A. Ballinger (Wife) 
counter-appeals. Although five children were born of the marriage, neither party 
raises issues on appeal relating to the children. Rather, Husband argues, among 
other things, that the trial court erred in its valuation of Wife's dental 
practice, and Wife argues the trial court erred in failing to divide certain 
"Plan B" retirement benefits of Husband. Based on our review, we affirm in part, 
reverse in part, and remand with directions.
BACKGROUND
¶2 The parties were married in 1990. Shortly before the marriage, Husband 
commenced employment with the City of Oklahoma City as a firefighter. In 1996, 
Wife started her dental practice. In November 2011, Wife filed a petition for 
divorce, and a trial was held over four days in July 2012.
¶3 Both parties hired experts to provide a valuation of Wife's dental 
practice. Husband's expert, a certified public accountant and valuation analyst, 
calculated the value of the dental practice using "the market method," and 
concluded it is worth $382,447. This calculation included a value of the 
marketable goodwill of the practice based upon comparable sales. In particular, 
the goodwill calculation was based upon the previous year's gross income of the 
dental practice - $765,480 - "multiplied by a goodwill percentage that comes 
from the market data" - 48.47% - resulting in a goodwill value of $371,028. To 
this goodwill value Husband's expert added $11,419, representing the tangible 
value of the dental practice, resulting in the total valuation of $382,447.
¶4 Wife's expert used a "net asset method" to calculate the value of the 
dental practice. This method did not include any intangible or goodwill value, 
but instead determined the value of the practice based on the funds that would 
be generated by a liquidation of the practice - i.e., by taking the total assets 
of the practice, which Wife's expert concluded equaled $154,668, and subtracting 
the total liabilities, which Wife's expert concluded equaled $155,777. 
Consequently, Wife's expert valued the practice at a negative amount: 
-$1,109.
¶5 The trial court rejected Wife's expert's valuation, stating in the divorce 
decree that Wife's expert "wound up on using only a net asset method, when both 
experts agree, and as their reports respectively indicate, that is typically not 
an acceptable method when valuing a dental practice." The decree also states 
that Wife's expert "admits that in some instances when utilizing a percent 
factor for gross revenue sales, one can achieve as much as 60-65%, whereas 
[Husband's expert] wound up with an amount of approximately 48%" - referring to 
the goodwill percentage used by Husband's expert - and that "even considering 
the average of other Oklahoma actual market transactional sales amounted to 
around 52%."
¶6 Regarding the method relied upon by Husband's expert, the decree states 
the market method is

 
 something that both experts agree is an acceptable method for valuation 
 of dental practices. . . .
 . . . [Husband's expert] researched the goodwill registry - something 
 that he testifies has become more and more reliable over the years; however, 
 he also researched market data transactions from . . . a former dentist who 
 has retired and engages in the purchase and sale of dental practices in the 
 Oklahoma area.
 . . . [Husband's expert] also made it clear that along with the other 
 criteria he specified for his assessment . . . he limited his data to actual 
 sales transactions, not to other valuation positions such as . . . when an 
 actual sale does not occur. This supports the reliability of [Husband's 
 expert's] data, and his ultimate value finding of $382,4[4]7 . . . 
 .
¶7 However, the trial court stated in the decree that the goodwill percentage 
used by Husband's expert "includes all goodwill, both personal and enterprise," 
and found that Husband's expert's valuation does not constitute "the fair market 
value of [Wife's] dental practice" because this "value does not separate 
personal and enterprise goodwill." The trial court found the value of the dental 
practice to be $160,686.61.
¶8 Regarding Husband's "Plan B" firefighter retirement benefits, a plan in 
which Husband had not yet elected to participate, the trial court found it would 
"not divide Plan B, it is not an asset to be divided . . . ." However, it stated 
that "if [Husband] should elect Plan B, that to the extent it may affect 
anything that [Wife] would be entitled to without that election, [Husband] is 
required to indemnify her and make sure that she is made whole."
¶9 The trial court divided numerous property items. Among other things, and 
pertinent to this appeal, the trial court awarded Husband "[t]he bulldozer at a 
value of $10,000.00," and found there existed marital debt in the form of two 
"401k [loans] with Fidelity Investments" in the total amount of $22,510.
¶10 From the divorce decree, Husband appeals, and Wife counter-appeals.
STANDARD OF REVIEW
¶11 "A divorce suit is one of equitable cognizance in which the trial court 
has discretionary power to divide the marital estate." Colclasure v. 
Colclasure, 2012 OK 97, ¶ 
16, 295 P.3d 1123 (footnote 
omitted). The division of property acquired during the marriage by the joint 
industry of the husband and wife must be fair, just and reasonable. Id.; 
43 O.S. Supp. 2012 § 121(B). 
"However, a marital estate need not necessarily be equally divided to be an 
equitable division because the words just and reasonable in § 121 are not 
synonymous with equal." Colclasure, ¶ 16 (footnote omitted). "The trial 
court has wide latitude in determining what part of jointly-acquired property 
shall be awarded to each party." Id. (footnote omitted). This Court will 
not disturb the trial court's decision regarding property division unless the 
trial court abused its discretion or the decision is clearly against the weight 
of the evidence. Standefer v. Standefer, 2001 OK 37, ¶ 19, 26 P.3d 104. See also 
Smith v. Villareal, 2012 OK 
114, ¶ 7, 298 P.3d 533 (In 
an action of equitable cognizance there is a presumption in favor of the trial 
court's findings and they will not be set aside unless the trial court abused 
its discretion or the finding is clearly against the weight of the evidence.). 
Likewise, the decision of the trial court to classify property as marital or 
separate will not be disturbed on appeal unless clearly contrary to the weight 
of the evidence. Standefer, ¶ 18. "[T]he trial court's choice of 
method for the valuation of marital property and its determination of value will 
not be disturbed on appeal unless contrary to law or the clear weight of the 
evidence." In re Marriage of Lahman, 2009 OK CIV APP 26, ¶ 13, 209 P.3d 793 (citations 
omitted).
ANALYSIS
I. Valuation of the Dental Practice (Husband's 
Argument)
¶12 Husband argues the trial court erred in its valuation of Wife's dental 
practice.[1] In 
particular, Husband asserts that "when utilizing actual market sales data" - as 
his expert did - "the issue of distinguishing between 'enterprise' versus 
'personal' goodwill is completely avoided, because it is only the 'enterprise' 
goodwill that can result in the sale of a dental practice." Accordingly, Husband 
asserts the trial court erred in finding Husband's expert's valuation did "not 
separate personal and enterprise goodwill," and he argues that the trial court, 
therefore, erred in reducing Husband's expert's valuation on this basis. Husband 
asserts the trial court "made no findings to justify its significant deviation 
from the only credible value in evidence," and requests that this Court 
determine that the value of Wife's dental practice equals the amount calculated 
by his expert.
¶13 In Mocnik v. Mocnik, 1992 OK 99, 838 P.2d 500, the Oklahoma Supreme 
Court stated, "[i]f goodwill is to be divided as an asset, its value should be 
determined either by an agreement or by its fair market value. Both of these 
methods are widely accepted for valuing goodwill." Id. ¶ 21 (citation 
omitted). "Market value is the price negotiated by a willing buyer, not 
obligated to buy, and a willing seller, not obligated to sell, in a free and 
open market. The term market value has been construed as synonymous with actual 
value." Howell v. Texaco, Inc., 2004 OK 92, ¶ 17, 112 P.3d 1154 (citations 
omitted).
¶14 Regarding the definition of goodwill, the Oklahoma Supreme Court has 
explained:

 
 Goodwill has been defined as the "favor or prestige that a business has 
 acquired beyond the mere value of what it sells." The Oklahoma Statutes 
 define it as, "the expectation of continued public patronage . . . ."[2] According 
 to Travis [v. Travis, 1990 OK 57, 795 P.2d 96,] the goodwill value 
 of a business "is the value that results from the probability that old 
 customers will continue to trade with an established 
concern."
Mocnik, ¶ 14 (citations omitted) (footnote added). See also 
Freeling v. Wood, 1961 OK 
113, ¶ 12, 361 P.2d 1061 
(Goodwill "has been defined as the custom or patronage of any established trade 
or business; the benefit or advantage of having established a business and 
secured its patronage by the public.").
¶15 If the value arising from the favor or prestige of a practice, or from 
its expectation of continued public patronage, "depends on the continued 
presence of a particular individual," then this value, "by definition, is not a 
marketable asset distinct from the individual." Travis v. Travis, 1990 OK 57, ¶ 10, 795 P.2d 96 (citation omitted). On 
the other hand, if this value

 
 is a marketable business asset distinct from the personal reputation of a 
 particular individual, as is usually the case with many commercial 
 enterprises, that goodwill has an immediately discernible value as an asset 
 of the business and may be identified as an amount reflected in a sale or 
 transfer of a business.
Id. (citation omitted).[3]
¶16 Accordingly, if any portion of the goodwill of a practice constitutes 
a truly marketable asset, it may be used in determining the market value of 
the practice. To the extent the goodwill of a practice constitutes a marketable 
asset, it is, "by definition," distinct from a particular individual. See 
Travis, ¶ 10.[4]
¶17 In Traczyk v. Traczyk, 1995 OK 22, 891 P.2d 1277, the Oklahoma Supreme 
Court upheld a fair market value calculation of the goodwill of a podiatry 
clinic operated by the husband (Dr. Traczyk) through a wholly owned professional 
corporation (the Bethany Foot Clinic). In Traczyk, the expert witness 
"took the previous year's gross income" of the Bethany Foot Clinic, "and 
multiplied it by the 32% figure" - a figure representing, according to the data 
relied upon by the expert, the average percentage of podiatry patients that stay 
with a podiatry clinic when one is sold to a new doctor - to arrive at a market 
value of the goodwill of the business. Id. ¶¶ 12-13.
¶18 The Traczyk Court explained its holding as follows:

 
 Although many of Dr. Traczyk's patients would not continue to patronize 
 the Bethany Foot Clinic were Dr. Traczyk to sell to another podiatrist, 
 competent evidence indicates that many would stay. Indeed, Dr. Traczyk may 
 use the goodwill as a selling point to potential purchasers. . . .
 That percentage of patients who continue at the clinic after its transfer 
 may be considered the goodwill of the clinic in this case. The undisputed 
 evidence was that 32% of Husband's patients would be expected to 
 remain.
Id. ¶¶ 14-15 (citation omitted). In particular, "[t]he range from 
which [the expert] obtained the [32%] average was 21% to 44% of clients 
staying," and the expert "took the previous year's gross income at the clinic 
($324,201.51) and multiplied it by the 32% figure to arrive at a goodwill value 
of $103,744.00. Adding this to the value of the remaining business assets, the 
expert found the total value of the Bethany Foot Clinic to be $152,605.44." 
Id. ¶¶ 12-13.
¶19 In the present case, Husband's expert used the previous year's gross 
income of Wife's dental practice - $765,480 - in his goodwill-value calculation. 
As noted by the Traczyk Court, "the traditional method used in valuing a 
medical practice is the previous year's gross income . . . ." Id. ¶ 13. 
The use of the previous year's gross income was especially appropriate in this 
case because the gross income of Wife's dental practice had consistently risen 
from year to year.[5] Husband's expert then multiplied the previous year's 
gross income by a "goodwill percentage" - 48.47% - resulting in a goodwill value 
of $371,028. Husband's expert testified that this goodwill percentage was based 
upon comparable sales of dental practices "where they'd allocated the purchase 
price" to show the amount paid for the tangible assets and the amount paid for 
the goodwill. Husband's expert testified, "And then from that I calculated what 
the goodwill percentage was based upon the most recent year's gross income."
¶20 Husband's expert testified the goodwill percentages for comparable sales 
of dental practices in Oklahoma "fall in a pretty tight grouping with the lowest 
being 40 percent and the highest being 53 percent[.]" He testified that two of 
the comparable sales were of dental practices in Oklahoma City (i.e., close to 
Wife's practice in Edmond) that were sold in 2011. One of these had a gross 
income of $710,000, "in the same range" as Wife's practice. The portion of the 
sale price for the goodwill of this practice was $341,302, and the "goodwill 
allocation" was, therefore, "48.07 percent of the gross income for the year." He 
testified, "that's a pretty good comparable. And I thought with all these 
others, everything is there within a pretty tight bunch. Everything is just 
pretty close. There's not too much variation within those numbers."
¶21 Husband's expert testified he also reviewed national "Goodwill Registry 
information" that included data from 1,949 dental practice valuations. He 
testified there was so much data that he only looked at sales from the most 
recent year, 2011, and only at sales of dental practices that were located in 
urban areas and that had a gross income between $700,000 and $899,000. The 
goodwill percentages from these sales ranged from 37% to 70%. One of the sales 
was of a dental practice in Oklahoma that had a gross income of $715,940 and a 
goodwill percentage of 48.47%, i.e., the goodwill percentage adopted by 
Husband's expert. Husband's expert testified he believed this particular sale 
"was a really good comparable." He testified there was "a lot of consistency in 
the goodwill values within each of these that were selected that fell within 
somewhat the same gross income range. And . . . the average of these goodwill 
percentages is 52.92[%]." However, he testified he selected a slightly lower 
percentage - 48.47% - because it was the same goodwill percentage as the 
Oklahoma sale in the Goodwill Registry, and also because it was approximately 
the same goodwill percentage as the sale of the Oklahoma dental practice, 
discussed above, with a gross income of $710,000 and a goodwill percentage of 
48.07%.
¶22 We conclude that the method utilized by Husband's expert adequately 
distinguished between "personal" and "enterprise" goodwill. That is, it 
distinguished between the goodwill of the dental practice that, according to 
comparable sales, constitutes a marketable asset, and that portion of the 
prestige or expectation of continued public patronage of Wife's practice that is 
not marketable because dependent on her continued presence. The trial court, 
therefore, erred when it found Husband's expert's valuation did "not separate 
personal and enterprise goodwill," and when it reduced Husband's expert's 
valuation on this basis.
¶23 Because the trial court adopted Husband's expert's valuation method but 
reduced the value of the dental practice to $160,686.61, it follows that the 
trial court implicitly determined the goodwill percentage to be around 20%, 
rather than the 48.47% proposed by Husband's expert. However, the range of 
marketable goodwill percentages in the first set of data relied upon by 
Husband's expert was from 40% to 53%.[6] In the second set of data relied upon by Husband's 
expert, the range was from 37% to 70%. We conclude the trial court's 
determination regarding the fair market value of the goodwill of the practice is 
clearly against the weight of the evidence.
¶24 Accordingly, we reverse the trial court's valuation of Wife's dental 
practice, and we remand with directions to the trial court to recalculate an 
appropriate value for the dental practice within the range of the evidence 
presented and in a manner consistent with this Opinion. Following a 
recalculation of the practice's value, the trial court is directed to 
recalculate the amount of property division alimony, and to make any other 
adjustments as may be required for an equitable division of the marital 
estate.
II. Value and Ownership of the Bulldozer (Husband's 
Argument)
¶25 Husband asserts he and Wife had only a one-half interest in the 
bulldozer, and that the other one-half interest was owned by his brother. 
Husband further asserts the bulldozer is worth only $4,000, and that Husband and 
Wife's interest is, therefore, worth only $2,000. He argues the trial court 
erred by awarding him "[t]he bulldozer at a value of $10,000.00."
¶26 As to Husband's assertion that the bulldozer is worth only $4,000, Wife 
testified she believes the bulldozer is worth anywhere between $10,000 and 
$27,000, and Husband admits he testified he bought the bulldozer for nearly 
$10,000 in 2005. As to the ownership of the bulldozer, Husband asserts the 
bulldozer is owned equally with his brother - he testified his brother paid half 
the price when they bought it. Wife does not deny this assertion, and testified, 
on cross-examination, that she has seen two checks from Husband's brother 
totaling "[c]lose" to "about half of the purchase price" of the bulldozer.
¶27 We conclude the trial court's determination as to the value of the 
bulldozer is not clearly against the weight of the evidence. However, we 
conclude the trial court erred in its determination as to ownership, and that 
the trial court should have determined Husband's brother owns a one-half 
interest equal to $5,000 of the total $10,000 value. Therefore, the trial court 
should have awarded Husband a one-half interest in the bulldozer at a value of 
$5,000, and the divorce decree is modified accordingly.
III. Credit to Wife for Two 401(k) Loans (Husband's 
Argument)
¶28 Husband argues the trial court erred in reducing the marital estate based 
on two "401k [loans] with Fidelity Investments" in the total amount of $22,510. 
He first argues that these loans were not appropriate business loans for Wife's 
dental practice. Husband states that even Wife's expert testified that if these 
loans exist, they would constitute personal loans rather than business loans. 
Husband also argues Wife failed to present evidence, other than her own 
self-serving testimony, as to the existence of these loans.
¶29 In response, Wife does not deny she failed to present evidence other than 
her unsupported testimony regarding the existence of these loans,[7] but argues 
"that it would be absurd for [me] to simply make up the existence of these debts 
and lie under oath regarding the existence of the debts . . . ."
¶30 We conclude the trial court erred in finding there exists marital debt in 
the form of two loans with Fidelity Investments in the total amount of $22,510. 
Wife testified the loans were taken solely for business purposes. This testimony 
was contradicted by Husband's expert who testified, among other things, that "a 
401K may not, by law, make a loan to its planned sponsor," Wife's dental 
practice. Absent any documentation demonstrating the existence of these loans, 
we conclude the trial court's determination in this regard is clearly against 
the weight of the evidence. Therefore, this portion of the divorce decree is 
reversed.
IV. Husband's Plan B Retirement Benefits (Wife's 
Argument)
¶31 Finally, we reject Wife's argument that the trial court erred in its 
determinations regarding the Plan B benefits. Retirement pensions constitute 
jointly-acquired property subject to equitable division in a divorce, absent a 
specific statutory exemption. Christmas v. Christmas, 1990 OK 16, ¶ 9, 787 P.2d 1267 (citation omitted). 
"Whenever a divorce occurs, either before or after retirement, a district court 
possesses the power to award the respective spouses the property to which each 
of them is entitled. Pension benefits accumulated during the marriage as jointly 
acquired property are subject to equitable division in a divorce." Tubbs v. 
State ex rel. Teachers' Ret. Sys. of Okla., 2002 OK 79, ¶ 12, 57 P.3d 571 (citation omitted) 
(emphasis omitted). Unlike disability benefits received after a divorce to 
replace post-marriage wages, which constitute the recipient's separate property, 
retirement pensions "function as a substitute for life savings" - i.e., "[i]f a 
worker was not provided retirement coverage, the additional wages received would 
presumably be saved for superannuation. These savings, earned during the 
marriage, would unquestionably constitute joint property." Christmas, ¶ 
7. Here, as the trial court explained in the divorce decree, the parties 
stipulated that Husband's "defined benefit plan accruing from date of marriage" 
and through the date the petition for divorce was filed constitutes marital 
property subject to equitable division. The trial court awarded Wife

 
 one-half of the marital portion only of [Husband's] Oklahoma 
 Firefighter's Pension and Retirement System defined benefit plan, the same 
 to be accomplished by a proper Domestic Relations Order which the Court 
 shall retain jurisdiction over this matter to the extent necessary to ensure 
 and enforce completion and proper processing of a Domestic Relations 
 Order.
¶32 However, Wife argues the Plan B benefits, in which Husband has not 
elected to participate, are also subject to equitable division. That is, 
Wife admits "it is undisputed that, as of the date of trial, [H]usband had not 
elected to participate in Plan B," but argues that because Husband has "gained 
the right to choose Plan B benefits at any time he wishes primarily as a result 
of marital efforts," those benefits should be divided, in advance of this 
hypothetical election, as marital property. Although the Plan B benefits in 
question constitute retirement benefits rather than disability benefits, we 
disagree with Wife that the mere possibility of Husband electing to participate 
in Plan B in the future necessitates the division of those benefits by the trial 
court. "A district court possesses the power to adjudicate all of the property 
rights held by the spouses in the retirement benefit," Tubbs, 2002 OK 79, ¶ 17, but the Plan B 
retirement benefits at issue here are merely speculative and hypothetical.
¶33 In the divorce decree, the trial court explained that Husband was not 
currently participating in Plan B and had not elected to do so. Regarding Plan 
B, the trial court found

 
 it will not divide Plan B, it is not an asset to be divided; provided, 
 however, the Court wants the record to be clear in its final order that if 
 [Husband] should elect Plan B, that to the extent it may affect anything 
 that [Wife] would be entitled to without that election, [Husband] is 
 required to indemnify her and make sure that she is made whole. For example, 
 if it reduces the monthly amount [Wife] is entitled to receive under the 
 retirement as a result of [Husband's] election, then [Husband] is required 
 to make up that difference. The fact that [Husband] may elect Plan B is not 
 going to be allowed to affect what [Wife] has been awarded from the defined 
 benefit retirement plan.
¶34 We conclude that the trial court's determinations regarding Husband's 
retirement benefits satisfy the requirement that the property acquired during 
the marriage be divided in a manner that is fair, just and reasonable, 43 O.S. Supp. 2012 § 121(B), and the 
trial court did not err in its determinations regarding Husband's retirement 
benefits.[8]
CONCLUSION
¶35 We affirm the trial court's determinations as to the Plan B benefits. 
However, we reverse the trial court's valuation of Wife's dental practice, and 
we remand with directions to the trial court to calculate an appropriate value 
for the dental practice within the range of the evidence presented and in a 
manner consistent with this Opinion. We also reverse and modify the trial 
court's determination as to the bulldozer. The trial court should have awarded 
Husband a one-half interest in the bulldozer at a value of $5,000. Finally, we 
reverse the finding that there exists marital debt in the form of two loans with 
Fidelity Investments in the total amount of $22,510. Following a recalculation 
of the dental practice's value, and after taking into account the modification 
of the bulldozer award and reversal of the finding as to the two loans, the 
trial court is directed to recalculate the amount of property division alimony, 
and to make any other adjustments as may be required for an equitable division 
of the marital estate.

¶36 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH 
DIRECTIONS.

WISEMAN, P.J., and GOODMAN, J., concur.

FOOTNOTES

[1] A 
professional practice acquired during the marriage is marital property subject 
to equitable division. See, e.g., Mocnik v. Mocnik, 1992 OK 99, 838 P.2d 500.

[2] 
Pursuant to 60 O.S. 2011 § 315, 
"[t]he goodwill of a business" is defined as "the expectation of continued 
public patronage . . . ."

[3] In 
Travis, the Supreme Court concluded that, under the facts presented, the 
favor or prestige (or expectation of continued public patronage) of the 
husband's sole practitioner law practice did not have a value distinct from the 
attorney/husband, and, therefore, his law practice did not have a goodwill value 
subject to equitable division. Among other things, the Travis Court 
stated that "law practices cannot be bought and sold as can other professional 
practices . . . ." Id. ¶ 12. In Mocnik, the Supreme Court 
explained its holding in Travis as follows: "We held in Travis 
that the law practice of a sole practitioner had no goodwill value because 'the 
reputation of the lawyer cannot be purchased by another seeking to acquire an 
established practice.' This is especially true when the professional is a sole 
practitioner." Mocnik, ¶ 14 (citation omitted).

[4] That 
is, the Travis Court stated that to the extent goodwill depends on the 
continued presence of a particular individual, it is to that extent not 
marketable. It follows deductively that if any of the goodwill is 
marketable, that portion of the goodwill is not dependent on the 
continued presence of a particular individual.

[5] As 
stated in the divorce decree, "the evidence was not in dispute that [Wife's] 
income almost always increases year after year," and, consequently, Wife's 
expert's decision to "utilize[] a three year weighted average of [Wife's] income 
. . . caused a skewed negative reduction in her income."

[6] This 
range excludes the sales of the two practices listed with gross incomes of 
$470,849 and $1,225,282, respectively. These gross incomes are outside the range 
of the other comparable sales, and do not appear to have been relied upon by 
Husband's expert.

[7] We note 
that Wife's Exhibit 70 Fidelity Investments report does not contain any indicia 
of the alleged loans.

[8] We also 
conclude the trial court's determination is consistent with 11 O.S. 2011 § 49-126(9), which 
provides, pertinent to this case, that a spouse "shall have a right to receive 
benefits payable to a member of the System under the Oklahoma Firefighters 
Deferred Option plan provided for pursuant to Section 49-106.1 of this title, 
but only to the extent such benefits have been credited or paid into the 
member's Oklahoma Firefighters Deferred Option Plan account during the term of 
the marriage."





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2009 OK CIV APP 26, 209 P.3d 793, LAHMAN v. LAHMAN
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1990 OK 16, 787 P.2d 1267, 61 OBJ 569, Christmas v. Christmas
Discussed
 1990 OK 57, 795 P.2d 96, 61 OBJ 1778, Travis v. Travis
Discussed at Length
 1992 OK 99, 838 P.2d 500, 63 OBJ 2005, Mocnik v. Mocnik
Discussed at Length
 2001 OK 37, 26 P.3d 104, 72 OBJ 1190, STANDEFER v. STANDEFER
Discussed
 1961 OK 113, 361 P.2d 1061, FREELING v. WOOD
Discussed
 1995 OK 22, 891 P.2d 1277, 66 OBJ 1102, Traczyk v. Traczyk
Discussed
 2002 OK 79, 57 P.3d 571, TUBBS v. STATE EX REL. TEACHERS' RETIREMENT SYSTEM
Discussed at Length
 2004 OK 92, 112 P.3d 1154, HOWELL v. TEXACO, INC.
Discussed
 2012 OK 97, 295 P.3d 1123, COLCLASURE v. COLCLASURE
Discussed
 2012 OK 114, 298 P.3d 533, SMITH v. VILLAREAL
Discussed
Title 11. Cities and Towns
 Cite
Name
Level

 11 O.S. 49-126, Pensions and Allowances Exempt from Forced Sale - Not Assignable
Cited
Title 43. Marriage
 Cite
Name
Level

 43 O.S. 121, Restoration of Maiden or Former Name - Alimony - Property Division
Discussed
Title 60. Property
 Cite
Name
Level

 60 O.S. 315, Goodwill
Cited