2001 OK 37

**Charles STANDEFER,
Plaintiff/Appellant,**

v.

**Cynthia Birdsong STANDEFER,
Defendant/Appellee.**

**No. 93,785.**

Supreme Court of Oklahoma.

April 24, 2001.

As Corrected June 25, 2001.

Rehearing Denied June 26, 2001.

Richard A. Shallcross, Shallcross Graves & Associates, Tulsa, OK, for Appellant.

Nancy Nesbitt Blevins and Paul E. Blevins, Blevins & Sordahl, Inc., Pryor, OK, for Appellee.

HODGES, J.

¶ 1 The following issues are presented for this Court's review: (1) Whether the district court properly found a common-law marriage existed as of November 1988; (2) Whether the district court erred by including funds acquired from a settlement in a personal injury suit as part of the marital estate; and (3) Whether the division of property was equitable.

## I.  Facts

¶ 2 Charles Standefer and Cynthia Birdsong began cohabitating in November of 1988. At the time, Cynthia had two children from a previous marriage. As a result of the death of her husband from the previous marriage, Cynthia and the two children were receiving social security benefits. Charles was a truck driver. Cynthia worked for a time during the cohabitation as a waitress and at another time as a medical care giver.

¶ 3 On September 28, 1996, while on a metal-roofed shed adjacent to the home in Chouteau, Oklahoma, Charles came in contact with a high voltage electrical wire. As a result of the electrocution, Charles was burned over 65% of his body, had numerous operations, had diminished use of his legs, and, for social security purposes, is 100% disabled. At the time of the accident, Cynthia was in the house. When she saw a bluish ball of fire and heard a horrible noise, she went outside. When Cynthia saw flames coming out of both of Charles' legs, she started shaking. Then, Cynthia turned the electricity off, ran in the house, and called 911. The rescue team removed Charles from the shed, and he was air lifted to a medical center in Tulsa.

¶ 4 Charles was in a burn center for three months. During most of this time, Cynthia rented a room and stayed at the hospital. Her parents and friends helped care for her children. Most weekends, she would bring the children to the hospital to visit Charles. When Charles was moved to a rehabilitation center, Cynthia returned to live at home but made daily trips to the hospital. When Charles returned home, Cynthia helped him with daily activities, changed his bandages, provided medical assistance, pushed his wheelchair, and gave other necessary assistance.

¶ 5 On February 5, 1997, Charles and Cynthia and Cynthia on behalf of her two children filed a lawsuit against one of the tortfeasors (Tortfeasor I). Charles sought compensation for his injuries and Cynthia and the children for loss of consortium. The law suit was settled. Even though they were informed that they could seek separate settlements, Charles and Cynthia instructed their attorneys to seek one lump-sum settlement. Charles stated that he wanted Cynthia to be taken care of if anything should happen to him. Charles and Cynthia were insistent that their claims should be joined and that they negotiate for and receive a combined settlement.

¶ 6 On November 12, 1997, Charles, Cynthia, and the children signed a "Memorandum of Agreement by Plaintiffs Regarding Settlement of Their Lawsuit" and directing the disbursement of the funds from the settlement. The parties acknowledged that they had the right to individually consult separate attorneys regarding their rights but elected not to do so. The children acknowledged that their claims were not legally recognized and, therefore, of dubious value. The memorandum stated specifically:

> Specifically, Charles R. Standefer and Cynthia Birdsong Standefer understand and acknowledge that their claims against [Tortfeasor I] were different in kind and value and that they freely choose that all payments made under the terms of the settlement be made [jointly] rather than to them individually in separate amounts. Charles R. Standefer and Cynthia Birdsong Standefer further acknowledge that they directed their attorneys not to negotiate separate settlements from [Tortfeasor I], but that their interests in the case be pursued collectively and result in one settlement to be shared jointly by them and their family.

There was no document or other statement which allocated the settlement funds to specific items of loss or injury of Charles and Cynthia.

¶ 7 The Standefers received slightly over half of the settlement funds in cash.[1] Most of the cash was used for attorney fees, medical bills, and other bills which were incurred during the time after Charles' accident. With the remaining amount of settlement funds, Tortfeasor I purchased three annuities, one each from Metropolitan Life Insurance Company, from Berkshire Hathaway Life Insurance Company of American, and from United of Omaha Life Insurance Company. Charles and Cynthia dictated many of the terms of the annuities such as how they were to be paid and that the payments be made into a joint account. The Metropolitan Life annuity represented about 22.52% of the total value of the annuities, the Berkshire

---

1. Under the terms of the settlement agreement, the parties signed a nondisclosure statement. The parties filed the documents in the present appeal under seal. Thus, the exact amount of the settlement is not included in these facts.

Hathaway annuity represented about 38.22%, and the Omaha Life annuity represented about 39.26%. The monthly payments for the Metropolitan Life and Berkshire Hathaway annuities were to be paid for the life of Charles but no less than thirty years. The Omaha Life annuity was to be paid until the death of the last surviving of Charles or Cynthia but no less than twenty years. The Berkshire Hathaway annuity contract specifically stated that the interests of the payees, in this case Charles and Cynthia, were several and equal. The Omaha Life annuity policy listed Charles and Cynthia as the annuitants. The payments under each of these annuities were to be made monthly into an account held jointly by Charles and Cynthia. Charles and Cynthia were the payees for all the annuities. Charles wrote a check for $5,000.00 each month from the joint account and gave it to Cynthia to put in her separate checking account.

¶ 8 On December 24, 1997, Charles and Cynthia were married in a ceremony. In an attempt to show that they were not common-law spouses before the accident, Charles presented evidence that in January of 1995, Cynthia purchased a house (the Chouteau property, the place where Charles' injuries occurred) as a single person and that Charles and Cynthia had filed separate tax returns. In contrast, during the time after they started cohabiting, Charles gave Cynthia cards which stated they were for "his wife" or other indications that he considered Cynthia to be his wife. On March 30, 1992, Charles changed his insurance enrollment listing Cynthia as his wife and her two children as his stepson and stepdaughter. More importantly, Charles testified he considered that he and Cynthia were common-law married on Thanksgiving Day of 1988.

¶ 9 On July 26, 1998, Charles and Cynthia separated. However, before their separation Charles and Cynthia brought suit against the second tortfeasor (Tortfeasor II). In August of 1999, Charles settled this claim. However, Cynthia's claim remains pending.

## II. TRIAL COURT'S JUDGMENT

¶ 10 The district court found the following facts. Charles and Cynthia were common-law married as of Thanksgiving Day of 1988. Using the analytical method of division, the Tortfeasor II settlement funds were Charles' separate property, and Cynthia's claim against Tortfeasor II was her separate property. Certain vehicles were gifts to Cynthia's children and parents. The proceeds from the settlement with Tortfeasor I were marital property and that the analytical method of division of property was inapplicable based on Charles' and Cynthia's actions. The parties had equitably divided the proceeds of the annuities by their practice of Cynthia receiving a fixed monthly amount of $5,000.00 from the annuity payments. An IRS debt was Charles' separate property, and the other debts totaling $15,100 were marital debts. The court awarded approximately 62% of the marital assets to Charles and approximately 38% to Cynthia. The district court ordered that Cynthia should receive approximately one-third of the monthly payments from the annuities.

## III. COMMON–LAW MARRIAGE

¶ 11 On appellate review, a trial court's determination of the existence of a common-law marriage will not be disturbed if it is not clearly against the weight of the evidence. *Mueggenborg v. Walling*, 1992 OK 121, ¶ 5, 836 P.2d 112, 113. A common law marriage is formed when "the minds of the parties meet in consent at the same time." *Reaves v. Reaves*, 1905 OK 32, 82 P. 490. Some evidence of consent to enter into a common-law marriage are cohabitation, actions consistent with the relationship of spouses, recognition by the community of the marital relationship, and declarations by the parties. *See Reaves v. Reaves*, 1905 OK 32, 82 P. 490. The person seeking to establish a common-law espousal relationship has the burden to show by clear and convincing existence of the marriage. *See Maxfield v. Maxfield*, 1953 OK 390, ¶ 24, 258 P.2d 915, 921.

¶ 12 In the present case, Charles testified that "as far as [he] was concerned, [he and Cynthia] had been married since Thanksgiving of 1988." Cynthia likewise believed that they were common-law spouses

beginning in 1988. Other evidence of the common-law marriage is Charles listing Cynthia as his wife and her children as his stepchildren on his insurance and giving her cards to her as his wife, Charles and Cynthia celebrating their anniversary every year, her children giving them anniversary gifts, and Charles and Cynthia holding themselves out to others as spouses. The evidence is clear and convincing that both parties assented to a marriage on Thanksgiving Day of 1988. According to the record, the trial court's finding that a common-law marriage existed as of Thanksgiving of 1988 was not against the weight of the evidence.

## IV.  TRIAL COURT'S DECISION REGARDING PROPERTY

### A.  CLASSIFICATION OF PROPERTY

¶ 13 The trial court found that because of Charles' and Cynthia's actions, the Tortfeasor I settlement funds were marital property subject to an equitable division by the court. Charles argues that the trial court erred because it did not use the analytic method to divide the Tortfeasor I settlement funds and property acquired with the settlement funds.[2] Under the analytic method, personal injury awards are characterized as marital or separate property based on the purpose of the recovery. *Bandow v. Bandow*, 794 P.2d 1346, 1348 (Alaska 1990). "To the extent the recovery compensates for losses to the marital estate, it is marital property. To the extent the recovery compensates for losses to a spouse's separate estate, it is non-marital property." *Id.* (citations omitted). Although it applied the analytic method to the claims against Tortfeasor II, the district court found that this method was inapplicable to the Tortfeasor I funds based on the parties actions.

¶ 14 Section 121 of title 43 of the Oklahoma Statutes addresses division of marital property. Section 121 provides in part:

As to such property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall, subject to a valid antenuptial contract in writing, make such division between the parties as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to be paid such sum as may be just and proper to effect a fair and just division thereof.

Pursuant to this section, marital property, that is property jointly acquired during the marriage, comes under the jurisdiction of the court for equitable division. Having determined that Charles and Cynthia were married on Thanksgiving of 1988, the next inquiry is whether the Tortfeasor I settlement funds were jointly acquired as determined by the trial court.

¶ 15 "Jointly-acquired property" for purposes of section 121 is "property which is accumulated by the joint industry of both spouses during the marriage." *Gray v. Gray*, 1996 OK 84, ¶ 11, 922 P.2d 615, 619. Property acquired during the marriage is presumed to have been jointly acquired. *Id.* The party seeking to have the property categorized as separate property has the burden of proof. *Id.*

¶ 16 Spouses may treat separate property in a manner so that it alters their legal relationship to the property, and it becomes property of the marital estate. *See id.* Section 205 of title 43 specifically allows spouses to alter their legal relations as to property. In this case, Charles and Cynthia pooled their claims against Tortfeasor I and negotiated for a joint settlement. They instructed their attorneys to seek one settlement. They acknowledged in writing that their claims were different in kind and value, but nonetheless they wanted joint payments rather than separate payments. They sought and received a joint cash payment and had the annuities issued jointly. They had the payments from the annuities deposited into a jointly-held account. By these actions, any separate interest Charles or Cynthia had in their claims against Tortfeasor I lost it identity as separate property, and the

---

2. Charles makes an assertion in his brief on appeal that the $22,000 owed to the IRS was a marital debt. At trial, Charles testified that he considered this his separate debt.

settlement funds and property acquired with the funds became property of the marital estate by virtue of being jointly acquired.

¶ 17 In *Johnston v. Johnston*, 1968 OK 47, ¶ 14, 440 P.2d 694, 697, the parties to a divorce action combined their separate assets to jointly acquire a single asset. The trial court found the property had been acquired by joint efforts and contributions. This Court held that the finding was proper. Likewise, in the present case Charles and Cynthia combined their claims against Tortfeasor I to obtain a single settlement. As the property in *Johnston* was jointly acquired, so were the Tortfeasor I settlement funds.

¶ 18 The decision of the trial court classifying the Tortfeasor I funds as marital property will not be disturbed on appeal unless clearly contrary to the weight of the evidence. *See Manhart v. Manhart*, 1986 OK 12, ¶¶ 23, 33, 725 P.2d 1234, 1239. Because of the manner in which the parties handled the Tortfeasor I settlement, the trial court's classification of the Tortfeasor I settlement funds as marital property is not clearly contrary to the weight of the evidence. Charles' argument that the assets having their genesis in Tortfeasor I funds are his separate property is predicated on a finding that the Tortfeasor I funds were his separate property. Because we find the trial court did not err in its finding that the Tortfeasor I settlement funds were marital property, Charles' argument concerning property acquired with the funds is no longer viable. Okla. Stat. tit. 43, § 121 (1991). Because the property was jointly acquired, it was subject to equitable distribution, and the court did not err in finding that the analytic method was not applicable to the annuities acquired from the Tortfeasor I settlement, funds accumulated from annuity payments, and other property acquired from Tortfeasor I settlement funds.

### B. EQUITABLE DIVISION OF PROPERTY

¶ 19 Charles asserts that if the Tortfeasor I settlement funds and the property acquired therefrom were marital property, the division was inequitable including the allocation of the marital debts to him. The trial court is vested with discretion in allocating marital property. *Gray*, 1996 OK 84, ¶ 15, 922 P.2d at 620. The allocation must be fair and equitable. Okla. Stat. tit. 43, § 121 (1991); *Gray*, 1996 OK 84 at ¶ 15, 922 P.2d at 620. Equitable division requires the allocation be just and reasonable. *Gray*, 1996 OK 84 at ¶ 15, 922 P.2d at 620. This Court will not disturb the trial court's decision regarding property division unless the trial court abused its discretion or the decision is clearly against the weight of the evidence. *Id.*

¶ 20 Cynthia was awarded a sum certain to be paid monthly from the Mutual of Omaha annuity. Charles calculated the property division by including the proportion of the value of the annuity represented by the monthly payment in Cynthia's share of the property division. Including this amount in the property division, Charles' opines that he is receiving only 60.8% of the marital estate, and Cynthia is receiving 39.2%. Charles has mistakenly included his separate debts and calculated some items more than once. According to the Court's calculations, Charles' percentage of the marital estate is approximately 62% and Cythnia's approximately 38%.

¶ 21 We agree with Charles that his injuries are extensive and that he will probably never be pain free. However, Charles has failed to show that the division is inequitable. He has not asserted that the income produced from his share of the marital estate is insufficient to meet his needs. Charles will receive 66.31%, or about two-thirds, of the income from the annuities, while Cynthia will receive about one-third. By awarding Charles 62% of the marital estate compared to the 38% awarded to Cynthia, the trial obviously considered Charles' disabilities in making the property division. This Court does not find an abuse of discretion or that the division, including the allocation of marital debts and the monthly payment from Cynthia's share of the Mutual of Omaha annuity, was contrary to the weight of the evidence.

## C. OTHER ALLEGATIONS OF ERROR

¶ 22 Charles' other allegations of error are grounded on a finding that the trial court should have used the analytic method to classify at least part of the Tortfeasor I settlement funds as Charles' separate property. Having found that the trial court did not error in its property allocation and division, these arguments are no longer viable.

## V. CONCLUSION

¶ 23 The trial court did not err in finding a common-law marriage beginning on Thanksgiving Day of 1988. The trial court's decision regarding classification of separate and marital property and its division of marital property was not against the weight of the evidence. All other allegations of error are no longer viable. Thus, the judgment of the trial court is affirmed.

AFFIRMED.

¶ 24 HARGRAVE, C.J., WATT, V.C.J., HODGES, KAUGER, BOUDREAU, WINCHESTER, JJ., concur.

¶ 25 OPALA, J., concurs in part III; dissents from part IV.

¶ 26 LAVENDER, J., with whom joins SUMMERS, J., concur in part; dissent in part.

SUMMERS, J. Concurring in part, dissenting in part and joined by LAVENDER, J.

¶ 1 I must respectfully dissent from the Court's decision insofar as it affirms the trial court's ruling that the Tortfeasor I settlement funds were marital property subject to division by the court. In my opinion the trial court erred in failing to apply the analytic approach to determine the underlying nature of that settlement and its components.

¶ 2 The courts of the various jurisdictions have devised three basic approaches to determine whether funds received by a spouse should be treated as separate property or joint property subject to marital division. They are called, respectively, either (1)mechanistic, (2) unitary, or (3)analytic. Under the mechanistic (or literal) approach, which

the trial court followed here, the time of the injury and recovery control the classification of the recovery. Under such approach, as in the instant case, if an award is acquired during marriage, it is deemed marital property regardless of the underlying purpose of the award or the loss it was meant to replace. See *Liles v. Liles*, 289 Ark. 159, 711 S.W.2d 447(1986); *Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430 (1986); *Marsh v. Marsh*, 313 S.C. 42, 437 S.E.2d 34(1993).

¶ 3 Directly contrary is the unitary approach, which characterizes the award to the injured spouse as uniquely personal, and treats the entire recovery as his or her separate property. It is not seen as jointly acquired property because it arises from fortuitous circumstances unrelated to a marital effort to acquire joint property. See *Unkle v. Unkle*, 305 Md. 587, 505 A.2d 849 (1986); *Gloria B.S v. Richard G.S.*, 458 A.2d 707 (Del.Fam.Ct.1982). Although Plaintiff pressed for the unitary approach in the trial court, on appeal he concedes that the Defendant's claim for loss of consortium, which was included in the Tortfeasor I settlement, would make the unitary approach unusable in this case.

¶ 4 The analytic approach, on the other hand, attempts to determine the underlying nature of the recovery before characterizing it as either separate or joint property. It requires the court to ask: What was the award intended to replace? The purpose for which the award or settlement is received controls its designation, so that to the extent the recovery is compensation for losses to the marital estate, it is marital property, and to the extent it is compensation for a personal loss to a spouse's separate estate, it is separate property. See *Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430 (1986); *Mistler v. Mistler*, 816 S.W.2d 241 (Mo.App.1991); *Kirk v. Kirk*, 577 A.2d 976 (R.I.1990).

¶ 5 The analytic approach has been consistently embraced by our cases and adopted by this Court. In *Christmas v. Christmas*, 1990 OK 16, 787 P.2d 1267, this Court held that disability insurance benefits received after a divorce were not joint property subject to equitable division in a divorce, but were separate property of the recipient spouse. In

reaching our decision the Court relied on an approach which focuses on the "replacement nature" of the benefits and classifies those benefits according to the nature of the assets they replace. The Court distinguished retirement benefits, which function as a substitute for life savings and would constitute joint property, from disability benefits received after divorce which would replace post-coverture wages and therefore be the wage earners's separate property. Using this analysis, the Court found it was the nature of the benefits as replacement for husband's wages which determined the classification, not the label of the funds as "disability pension."

¶ 6 Applying the instruction of *Christmas,* that replacement analysis requires the determination of the nature of the benefits, not simply looking at the label of the funds, the Court of Civil Appeals in *Rowlan v. Rowlan,* 1991 OK CIV APP 88, 817 P.2d 1285, found a wife was not entitled to share husband's federal disability pension including a survivor's annuity, because the nature of the wages replaced by the benefits were in the nature of wages lost from disability which was his separate property.

¶ 7 In *Crocker v. Crocker,* 1991 OK 130, 824 P.2d 1117, 30 A.L.R. 5th 768, this Court adopted the analytic approach, and held that a workers' compensation award is marital property only to the extent that it compensates for loss of the couple's income during marriage, and is separate property to the extent that it compensates for loss of post-divorce earnings by the injured spouse. We discussed the mechanistic, unitary and analytic approaches, and adopted the analytic one. In doing so, the Court found the "replacement approach" of *Christmas* helpful, as that analysis closely resembles the analytic approach, in that it attempts to determine the underlying nature of an award before deciding whether it constitutes separate or marital property.

¶ 8 The Court noted the analytic approach was derived from divorce actions involving the division of personal injury awards. The Court found that the injured spouse's separate property included economic losses which occurred after the marriage terminated, including the amount of the worker's compensation award which constituted loss of future wages and future medical expenses. The marital property subject to division encompassed the amount of the award which represented lost wages or lost earning capacity during coverture and medical expenses paid during the marriage.

¶ 9 In *Taylor v. Taylor,* 1992 OK CIV APP 22, 827 P.2d 911, the Court of Civil Appeals addressed the issue of whether the proceeds of a personal injury settlement in an action brought by husband for his injuries were his separate property, and therefore not subject to division as marital property in a divorce case. Based on *Crocker, Christmas* and *Rowlan* and decisions from other jurisdictions, the Court found that settlement proceeds may be marital property subject to division on divorce to the extent that they are intended to compensate the couple for past lost wages or past medical expenses that depleted the marital estate. Addressing the question of non-economic losses of the injured spouse, the Court relied on the analysis of various components of a personal injury judgment set forth in *Bandow v. Bandow,* 794 P.2d 1346, 1349 (Alaska 1990), a case where both spouses filed a malpractice action against husband's surgeon and received a substantial settlement including an annuity, which was not apportioned between items of damage or allocated for damages suffered by the parties. The trial court determined the annuity was marital property and awarded half to the wife. Addressing the issue of the characterization of the proceeds, the *Bandow* court found that states adopting the analytic approach generally hold that non-economic losses, both pre-divorce and post-divorce are the separate property of the injured party.

¶ 10 The *Bandow* court made a statement which is quite relevant here:

Damages for pain and suffering, mental anguish, and the like compensate for a loss which is so personal to the claimant spouse that classifying them as marital property would be inequitable.

Nothing is more personal than the entirely subjective sensations of agonizing pain, mental anguish, embarrassment because of scarring or disfigurement, and outrage at-

tending severe bodily injury. Mental injury, as well, has many of these characteristics. Equally personal are the effects of even mild or moderately severe injury. None of these, including the frustrations of diminution or loss of normal body functions or movements, can be sensed, or need they be borne, by anyone but the injured spouse. Why, then, should the law, seeking to be equitable, coin these factors into money to even partially benefit the uninjured and estranged spouse? In such case the law would literally heap insult upon injury. The uninjured spouse has his or her separate and equally personal right to an action for loss of consortium. Just as there is no equitable reason for that spouse to profit from his or her exmate's recompense for suffering, there is no justification for allocation of a share in the right to loss of consortium. The only damages truly shared are those discussed earlier, the diminution of the marital estate by loss of past wages or expenditure of money for medical expenses. Any other apportionment is unfair distribution. *Amato v. Amato*, 180 N.J.Super. 210, 434 A.2d 639, 643 (1981). See also *Landwehr v. Landwehr*, 111 N.J. 491, 545 A.2d 738, 742–43 (1988) (following Amato).

¶ 11 The *Bandow* court additionally found that analysis of "property acquired during coverture" or joint efforts required finding that non-economic losses should be treated as separate property, because tort recoveries, similar to inherited property, occur by "fortuitous circumstances entirely distinct from the efforts or economic undertakings of the marital partners," 794 P.2d at 1350.

¶ 12 In my opinion neither the way the settlement structure was requested nor the subsequent treatment of the proceeds by the parties excused the trial court from conducting an inquiry into the character of the funds. What was the settlement money intended to replace? It was not "jointly acquired" marital property under our established case law. It is the underlying nature of the purpose of the award which determines the classification as marital or separate property, and that determination has never been made. I would remand the matter to the trial court for its evaluation and allocation of the proceeds, using the analytic method.