IN RE THE MARRIAGE OF COTTON
2023 OK CIV APP 21
530 P.3d 872
Case Number: 119055
Decided: 07/29/2022
Mandate Issued: 06/01/2023
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2023 OK CIV APP 21, 530 P.3d 872

 

IN RE THE MARRIAGE OF:

JUDY RENEE COTTON, Petitioner/Appellee,
v.
GARY EUGENE COTTON, Respondent/Appellant.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE LYNNE MCGUIRE, TRIAL JUDGE

AFFIRMED

Thomas J. Daniel, IV, KIRK & CHANEY PLLC, Oklahoma City, Oklahoma, for Petitioner/Appellee

William E. Liebel, James T. Gorton, LAW OFFICES OF WILLIAM E. LIEBEL, Oklahoma City, Oklahoma, for Respondent/Appellant

GREGORY C. BLACKWELL, JUDGE:

¶1 The appellant, Gary Cotton, appeals decisions by the district court as part of a divorce decree. Specifically, Gary argues that certain jointly-titled real estate and bank accounts were not marital property, subject to equitable division between him and his now ex-wife, Judy Renee Cotton, who goes by Renee. On review, we find that the trial court neither abused its discretion nor made any finding that is against the clear weight of the evidence. Accordingly, we affirm.

BACKGROUND

¶2 Gary and Renee were married in 2005. On the eve of marriage, they executed a prenuptial agreement that suggests a significant imbalance between the assets each owned before marriage. Gary's list of separate property, attached to the agreement as Exhibit A, indicates separate property with a value in excess of nine million dollars. Renee's assets appear to have been far less. While the agreement states an "intent and desire" that the parties wished to keep and manage their separate property as separate, it nevertheless does allow the parties to transfer separate property to one another if they so desired.

¶3 During the marriage the parties purchased several pieces of real property. As relevant to this appeal, these properties were purchased with Gary's separate funds; nevertheless, title to the property was held by Gary and Renee, as joint tenants. There was no evidence that the choice to hold title together was made except by both parties' own election. Likewise, just prior to the filing of the divorce, the parties held three joint bank accounts--one checking and two money-market accounts--at least one of which held substantial assets.

¶4 In 2019, Renee filed for divorce. The only issue for trial was property distribution, particularly the question of whether the jointly-owned real estate and bank accounts were properly characterized as Gary's separate property or as marital property to be equitably divided. After a trial at which only Gary and Renee testified, the trial court determined that all of the jointly-titled property was marital property and divided the estate accordingly. Gary appeals.

STANDARD OF REVIEW

¶5 The question of whether property is separate and indivisible or joint and divisible within the meaning of 43 O.S. § 121Mothershed v. Mothershed, 1985 OK 23701 P.2d 405Carpenter v. Carpenter, 1983 OK 2657 P.2d 646Id. 

¶6 At trial, the party seeking to have the property categorized as separate property has the burden of proof. Standefer v. Standefer, 2001 OK 3726 P.3d 104Mueggenborg v. Walling, 1992 OK 121836 P.2d 112Carpenter v. Carpenter, 1982 OK 38

THE REAL ESTATE

¶7 The first set of challenged decisions involves five properties purchased by the couple in joint tenancy during the marriage. Some of these properties were owned at the time of divorce, but two had been sold, with Gary and Renee financing the purchase. In those cases, both Gary and Renee were shown as the lenders on the note.

¶8 Although each property was purchased in joint tenancy with funds from a joint account, Gary noted and Renee did not dispute, that the original source of the funds was Gary's separate property. Gary argued that it was his intent to keep the real estate purchased with those funds as his separate property and never intended to gift Renee any of it. Gary also argued, apparently in the alternative, that rather than purchasing properties as an individual with separate funds, what had actually happened was that he had loaned the purchase money from himself as an individual to himself and Renee as a couple. Renee denied any intent to become Gary's debtor, and Gary offered no documentary evidence of any loan between the spouses. As to each property, the trial court found:

It is undisputed that the parties acquired the ... property together and titled it jointly. Their intent was that it be joint property. Therefore, it is marital property subject to division by this Court. It was purchased without condition relative to any loan from Respondent [Gary] to the parties.

¶9 The law affords a strong presumption that the very act of titling what was separately-owned real estate in joint tenancy with your spouse effectuates a gift between spouses.

have acquired property in joint tenancy while cohabiting ... it is ordinarily immaterial how much money [either spouse] has actually contributed to the purchase of the property involved because a gift from one to the other is presumed. Absent any fraud or special agreement, where [a spouse] knowingly agrees and consents to the conveyance being made to themselves as joint tenants, either is estopped to deny the tenancy of the other.

Shackelton v. Sherrard, 1963 OK 193385 P.2d 898Larman v. Larman, 1999 OK 83991 P.2d 536See also Smith v. Villareal, 2012 OK 114298 P.3d 533Larman, ¶ 10 (emphasis removed).

¶10 Having reviewed the full record, we cannot say that the trial court's finding that the realty at issue was marital property was contrary to the weight of the evidence. Gary's evidence to rebut the presumption of a marital gift was limited to his own testimony as to his intent. But saying doesn't make it so, and the trial court was free to discount this testimony. His alternative argument--that the realty in question was purchased with an unspoken and undocumented loan from himself to his then wife--strains all credulity. "Generally, if one spouse has caused his or her separate property to be transferred to both spouses jointly, mere self-serving testimony that it was not intended as a gift is entitled to little weight." Bartlett v. Bartlett, 2006 OK CIV APP 112144 P.3d 173

BANK ACCOUNTS

¶11 The next challenged decisions involve three joint bank accounts. As with the real property, it was undisputed that the money originally transferred to fund these accounts was Gary's separate property. Like the joint real estate, it was also undisputed that Gary had placed the funds at issue, voluntarily, in joint accounts that Renee had full access to during the marriage and that the accounts were opened as "joint tenancy accounts with right of survivorship."

¶12 Published case law has taken several approaches to the question of joint bank accounts. In Gillett v. McKinney, this Court noted that "[a]lthough the deposit of separate funds into a joint account does change the title to those funds, merely placing one spouse's name on the title to separate property does not automatically convert the separate property into marital property." 2019 OK CIV APP 24440 P.3d 69Gillett applied an "intent" test similar to that used in divorce cases involving jointly-titled real property, including Smith and Larman, as discussed above. The case of Wigley v. Skelton, 1978 OK 26575 P.2d 1371Id. ¶ 17.

¶13 Another line of cases holds that the intent of the parties to create a joint tenancy account with right of survivorship is irrelevant if the right of survivorship is created by an unambiguous contract. In re Estate of Metz, 2011 OK 26256 P.3d 45 "[i]n the absence of fraud, accident, mistake or absurdity, the clear and explicit language embodied in the written instrument governs in determining the parties' true intent." Id. ¶ 13 (citing Johnson v. Butler, 1952 OK 207245 P.2d 720

¶14 As Raney v. Diehl, 1971 OK 28482 P.2d 585right of survivorship, but not an intent to create the prerequisite joint tenancy is not at all clear. In divorce cases, however, courts appear to routinely give little weight to the contract or deed that embodies the parties' intent to create a joint tenancy with right of survivorship, frequently holding that the unambiguous contract or deed creates no more than a "presumption of a gift," and looking to the extrinsic "intent" of the parties instead of the written agreement. Estate of Metz, however, specifically cautions against giving "little weight to the single instrument that embodied the parties' intent" to create a right of survivorship, and declares the contractually established intent controlling. Id. ¶ 11.

¶15 Reconciling these various approaches presents some difficulty. 

¶16 The analysis of the two Arvest accounts--a checking account and a money market account--is straightforward. Renee testified that these accounts were opened as joint accounts with the right of survivorship. The checking account operated like a typical household checking account, which the couple both used routinely. When Renee was injured in a vehicle accident, she paid medical expenses out of this account, and when she received a settlement on account of the accident, she paid this into the account. The couple routinely transferred money from the Arvest money market account into the Arvest checking account. The couple purchased real estate titled in joint tenancy from these accounts. Renee testified that she engaged in full use of both of these accounts. These accounts bear all the hallmarks of a commingled account and were titled jointly. Gary offered little in the way of a "collateral purpose" as to these accounts. Thus, we find the court did not abuse its discretion in finding these accounts to be marital property.

¶17 As for the Regent account, it was generally undisputed that despite being owned in joint tenancy, Renee did not use this account and there was no evident commingling. Gary testified that he opened this account to obtain a favorable introductory interest rate. He did not testify, however, that only joint account holders could obtain such a rate. He also testified that he added Renee's name to the account because he wanted her to have access to sufficient cash to continue with his business affairs--or hire someone to do so--if he became incapacitated. Later he agreed, in response to a question by opposing counsel, that the purpose of the joint account was also to "provide for [Renee] in case of [his] incapacitation or death." [Tr. July 7, 2020, p. 39].

¶18 The trial court ultimately found:

[Renee] has a present, joint, ownership interest in the bank accounts at issue when she was made a joint owner of them when they were opened. [Renee] never transferred or relinquished her ownership interest in the accounts. [Renee] deposited funds into one of the accounts. [Renee] spent money from the accounts. The accounts were treated and utilized as accounts of the marital estate. [Gary] was unable to prove by clear and convincing evidence, any purpose collateral to a gift for including [Renee] as a joint owner of the bank accounts at issue. [Gary's] actions were consistent with donative intent. The [Gary] presented self-serving testimony which was insufficient and unpersuasive to this Court.

¶19 As with the real estate, the trial court did not find Gary's stated collateral purpose convincing. The parties argue on appeal as to whether Gary's stated "collateral purpose" of providing money to manage his business affairs or to support Renee in the event of incapacity was sufficient to overcome the presumption that he intended a gift of his separate property by moving that property into joint accounts.

¶20 Our question is whether the trial court's failure to credit Gary's testimony was clearly contrary to the weight of the evidence or an abuse of discretion. Gary's testimony of a collateral purpose is open to challenge because he was clearly sophisticated in business with access to counsel. He conceivably should have understood that creating a joint account gave Renee access to the funds whether he was incapacitated or not. If his intention was to allow access only when incapacitated, a power of attorney would have been more appropriate. Caring for Renee after death could have been accomplished through estate planning. Several solutions far less drastic than creating joint accounts were available. Further, merely giving Renee access to a bank account without a power of attorney appears insufficient to allow her to actually manage Gary's otherwise separate business assets. The record also shows that Gary did keep a substantial amount of property separately titled after the marriage, property which Renee did not seek any portion of below.

¶21 There was certainly more than one possible answer to the question of intent here, and the district court was required to determine which of these alternatives was more credible. As the court did not find Gary's stated collateral purpose credible, the case falls back to the presumption of a gift, on which Renee prevails. We find a question of fact and credibility here, and that the trial court was within its discretion to find the accounts in question were divisible as marital property.

CONCLUSION

¶22 The prenuptial agreement here was not particularly strong. Although it stated an intent not to create joint property, it also specifically contemplated transfers that could do just that. Aside from this agreement, there was little relevant documentary evidence, and the question hinged largely on the credibility of the parties' testimony. "In a case of equitable cognizance it is for the trial court to determine the credibility of witnesses and the weight and value to be given their testimony." Sanders v. Sanders, 1997 OK CIV APP 67948 P.2d 719Carpenter v. Carpenter, 1982 OK 38645 P.2d 476

¶23 AFFIRMED.

WISEMAN, P.J., and RAPP, J., concur.

FOOTNOTES

1. It is the intent and desire of the parties that during their marriage, each of them shall be, and continue to be, completely independent of the other with respect to the management, enjoyment, possession and disposal of his or her separate property, whether now owned, or hereafter acquired except as may be otherwise provided in this Agreement. It is the further intention of the parties that all of their respective separate property, whether now owned or hereafter acquired, be and remain as separate property, free of any claim that either party might otherwise acquire by reason of the marriage or by reason of surviving the other party hereto as a surviving spouse.

2. Except as may otherwise be provided herein, all property, whether real, personal or intangible, now owned by each of the parties as separate property or hereafter acquired by either party in any manner and from whatever source as separate property, shall be managed, enjoyed, held and disposed of as his or her separate property in the same manner as though the marriage had never been entered into, and neither party shall acquire any right, title or interest in, or claim to, the separate property of the other party....

9. Notwithstanding any of the provisions of this Agreement, either party shall have the right to transfer or convey to the other any property or interest therein which may be transferred or conveyed during his or her lifetime or by will or otherwise upon death, and neither party intends by this Agreement to limit or restrict in any manner whatsoever the right and power of either party to make, or of the other party to receive, any such transfer or conveyance.

 Larman v. Larman, 1999 OK 83991 P.2d 536Smith v. Villareal, 2012 OK 114298 P.3d 533If you own separate property that you do not wish to share with another, do not allow a deed to be filed that announces to the world that you own that property with another. So doing should create joint ownership for all purposes, regardless of the intent of the parties, absent a defense such as fraudulent inducement or coercion. Nevertheless, we are duty-bound to apply the law as presently articulated by the Oklahoma Supreme Court, and do so here.

Neundorf v. Neundorf, 2006 OK CIV APP 10131 P.3d 142Neundorf, like this case, analyzed a prenuptial agreement, the Nuendorf court did not reference any paragraph similar to paragraph 9 of the agreement at issue in this case. See footnote 1, supra. Paragraph 9, which by its terms overrides any contrary provision of the agreement, puts to rest any notion that the prenuptial agreement in this case must be read to disallow the parties from gifting their separate property to one another, or that the agreement is the type of "special agreement" referenced in Shackelton. The agreement clearly contemplated that the parties might wish to, and had every right to, exchange their separate property for marital property. Gary's arguments envision a prenuptial agreement that simply does not contain paragraph 9. But the provision is there, and the trial court's reliance on it was natural and not an abuse of discretion.

Investments made by the Respondent from the Regent Bank Funds are also marital property, specifically: the receivable from the Shipman's in the amount of $240,000.00; the Schwab investment in the amount of $100,000.00; the two (2) Weokie certificates of deposit each; and the Tinker Federal Credit union certificate of deposit in the amount of $250,000.00. The Court awards [Gary] these existing investments at their principal values.

Gary argues here that one stated purpose--to care for Renee upon his untimely death--is "collateral" to the purpose of making a gift. However, it seems clear enough to us that this is not a "collateral" purpose at all. We would hold, absent current Oklahoma Supreme Court precedent, that using a joint bank account to transfer property after death inherently requires a present gift of the funds. In our view, the interests identified here are not "collateral" at all, and there is no justifiable reason to allow the subjective intent of the joint-account creator to enter in the analysis.