OSCN Found Document:PAYTON v APPLEGATE

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 PAYTON v APPLEGATE
2024 OK 41
Case Number: 120334
Decided: 06/11/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 41, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

In the Matter of the Estate of Teddy Lee Applegate, Deceased.
LARAINA PAYTON, TEDDY LEROY APPLEGATE, MERL APPLEGATE and ANGELA RASH, Appellants,
v.
CHARLENE APPLEGATE, Appellee.
CERTIORARI TO THE COURT OF CIVIL APPEALS, DIVISION I
¶0 In a probate matter, the District Court of Wagoner County, the Honorable Dennis Shook, ruled that the intestate decedent's cattle operation was marital property, not separate property, for purposes of distributing the decedent's estate. The Court of Civil Appeals, Division I, reversed. Decedent's widow sought certiorari review.
CERTIORARI PREVIOUSLY GRANTED;
COURT OF CIVIL APPEALS' OPINION VACATED;
ORDER OF THE DISTRICT COURT AFFIRMED
F. Mack Greever, Claremore, OK and Ashley M. Bibb, Tulsa, OK for Appellants.
Tommy R. Dyer Jr., Jay, OK for Appellee.
KUEHN, J.:
¶1 Teddy Applegate died intestate in September 2020. His heirs included his wife Charlene and, from a previous marriage, four children and one grandchild (the issue of a predeceased child). Applegate was a lifelong farmer and rancher. He raised cattle before he met Charlene and continued to do so until his death. The question before us is whether the trial court erred in finding that the assets on hand at Teddy's death which were related to his livelihood constituted marital property, such that under the laws of intestate succession, Charlene was entitled to one-half interest in them, leaving Applegate's other heirs to share equally in the remaining half. We find the trial court's ruling is supported by the clear weight of the evidence, and vacate the Court of Civil Appeals' decision to the contrary.
FACTUAL BACKGROUND
¶2 The relevant facts are undisputed.
[1] Teddy and Charlene began living together in 1991. In 1999, they combined funds to purchase ten acres of land. They later purchased a mobile home and lived on this acreage. The couple were formally married in 2004. Before and during their marriage, they converted titled assets into joint tenancy or acquired them as such, including their homestead, a savings account, a checking account, a certificate of deposit, and several vehicles.
¶3 Teddy raised cattle before he met Charlene and continued to do so until his death. At the time of Teddy's death, the herd comprised around twenty-six cows and a number of steers, heifers, and bulls. Teddy used a checking account to buy, sell, and purchase supplies for the cattle. In 2007, he added Charlene as a joint owner on that account, and she added Teddy as joint owner of her savings account. Charlene testified that they used these joint accounts for both business and household expenses. They purchased cattle, feed and other supplies with funds from these accounts, and when cattle were sold, the proceeds were deposited into the same joint accounts. Cattle were sold in either Teddy's name or in Charlene's name. Charlene also testified that she helped in caring for the cattle.
STANDARD OF REVIEW
¶4 Probate proceedings are equitable in nature. In re Estate of Holcomb, 2002 OK 90, ¶ 8, 63 P.3d 9, 13. On appeal, we presume the trial court's decision is correct, and will not disturb it unless it is clearly contrary to the weight of the evidence or to some governing principle of law. Matter of Estate of Fulks, 2020 OK 94, ¶ 9, 477 P.3d 1143, 1147.
ANALYSIS
¶5 Because Teddy died intestate and had heirs from a previous marriage, Charlene, his surviving spouse, is entitled to one-half of all property "acquired by the joint industry of the husband and wife during coverture," but must share Teddy's separate property equally with the other heirs. 84 O.S. § 213(B)(1)(d).[2] Property acquired by the joint industry of spouses during coverture is commonly referred to as "marital property," as distinguished from one spouse's separate property. In deciding whether an asset is marital or separate property, the same rules used in divorce proceedings are applied to probate proceedings. Matter of Estate of Hardaway, 1994 OK 30, ¶ 9, 872 P.2d 395, 398.
¶6 Property acquired during the marriage is presumed to have been jointly acquired; the party seeking to have it treated as separate property has the burden of proof. Standefer v. Standefer, 2001 OK 37, ¶ 15, 26 P.3d 104, 108. Assets classified as "separate property" include (1) property owned by a spouse before the marriage which was maintained as separate property during the marriage; (2) gifts, during the marriage, from a third party to one spouse or from one spouse to another; (3) descents or devises to one spouse during the marriage, maintained as separate property; (4) compensation received by one spouse for personal injury; and (5) the purchase or exchange of property using separately maintained assets. Hardaway, 1994 OK 30, ¶ 9. The cardinal principle is that property brought to the marriage by one spouse, or received during the marriage by one spouse, only keeps its separate status if it is "maintained in an uncommingled state." Thielenhaus v. Thielenhaus, 1995 OK 5, ¶ 9, 890 P.2d 925, 930 (emphasis added). See also Standefer, 2001 OK 37 at ¶ 16, 26 P.3d 104, 108-09; Umber v. Umber, 1979 OK 24, ¶¶ 11-12, 591 P.2d 299, 302.
¶7 Spouses are free to keep their separate property segregated, gift it entirely to their partner, or transform it into a marital asset by transmutation or commingling. The court's objective is to identify and effectuate the parties' intent. See e.g. Larman v. Larman, 1999 OK 83, ¶¶ 8-10, 991 P.2d 536, 540-41 (whether transfer of separate property was intended as a gift to marital estate depended on evidence of intent). Specific words or actions are not necessary; the court must look to all surrounding circumstances to determine how the property in question was viewed during the marriage. Marshall v. Marshall, 1961 OK 86, ¶ 15, 364 P.2d 891, 894. Of course, how the parties viewed their assets during their marriage can be quite different from how they would like to view them when they file for divorce, or how heirs might like the court to view them when one spouse has died.
¶8 No one disputes that Teddy's livelihood before the marriage involved buying, raising, and selling cattle, that he had assets related to this endeavor when he married Charlene, and that he continued ranching for the rest of his life. Nor is there any dispute that all of the cattle in existence at the time of Teddy's death were acquired during the marriage. Appellants claim that because Teddy entered the marriage with cattle, and the couple owned cattle at the time of Teddy's demise, the existing cattle necessarily relate back to the original herd, and it was Charlene's burden to prove that Teddy intended to transform the business into marital property. They demand that Charlene "show receipts," as it were, to document the value (if any) that she added to the business during the marriage. Charlene, however, contends that she and Teddy intended the raising of cattle to be a joint endeavor, and that all of the evidence supports a conclusion that the cattle and hay are marital property.
[3]
¶9 The income or increase of separate property owned prior to marriage, which accrues without the aid or effort of the non-owning spouse after marriage, retains its nature as separate property. See e.g. In re Pierce's Estate, 1932 OK 757, ¶ 13, 17 P.2d 411, 412; In re Wagner's Estate, 1936 OK 724, ¶ 10, 62 P.2d 1186, 1189-1190. Thus, offspring of separate property livestock presumptively retains its character as separate property. But the initial burden of proof is upon the party claiming the increase should be considered separate property to establish that the subject livestock are, in fact, offspring of livestock that was treated during the marriage as separate property.[4]
¶10 The record before us fails to identify the specific cattle that may or may not be the offspring of separate property livestock. In fact the record affirmatively sets forth a clear pattern of both commingling and enhancements contributed by Charlene. Well before he and Charlene formally married, Teddy treated ranching as a joint effort. That change is evidenced by how the couple titled their bank accounts, how they commingled cattle-related income and expenses with personal income and expenses, and how they both contributed time and effort to raising cattle.
[5] The commingling of assets for joint use and enjoyment is reasonably viewed as a contribution to the marital estate. Owens v. Owens, 2023 OK 12, ¶ 37, 529 P.3d 905, 916.
¶11 Appellants claim that the buying and selling of cattle over the years was nothing more than a change in the form of Teddy's separate property, an "exchange" from cattle to cash and cash to cattle. See Reynolds v. Phipps, 1923 OK 159, ¶ 10, 213 P. 855, 857 (separate property does not lose its separate character merely because it changes form). This characterization ignores two important facts. First, any such "exchanges" were accomplished through a jointly-held bank account. Funds related to the purchase, care, and sale of cattle were commingled with those used for the couple's general expenses. This commingling supports an inference that Teddy intended to share his ranching endeavors with Charlene. See Standefer, 2001 OK 37 at ¶ 16 (spouses commingled separate personal-injury settlements to create a single marital asset); Umber, 1979 OK 24 at ¶¶ 11-12 (husband commingled funds from sale of his pre-marital business with wife's separate funds to start new business that was marital property); compare Mothershed v. Mothershed, 1985 OK 23, ¶¶ 11, 18-19, 701 P.2d 405, 408, 410 (stock shares were wife's separate property where they were given to her in her name only, and she maintained them separately during marriage).[6]
¶12 Appellants also fail to appreciate the nature of the particular assets here. To be sure, ranching was Teddy's livelihood -- and apparently the couple's only livelihood. But we are presented with no evidence that it was a discrete business entity. We are not dealing with shares of corporate stock; we are dealing with livestock and hay. Cattle cannot be stored in a safe-deposit box. Unlike jewelry or cash, they require land, water, feed, medicine, and other supplies. Unlike a certificate of deposit or savings bond, they do not mature by themselves. The very existence of livestock and crops depends on efforts unlike those needed for many other assets. See Elder v. Elder, 824 S.W.2d 520 (Mo.App. 1992) (cattle born during couple's marriage were marital property, even if they were offspring of cattle that one spouse owned before the marriage); In re Marriage of Williams, 639 S.W.2d 236 (Mo.App. 1982) (same).
[7]
¶13 The cattle Teddy owned when he married Charlene are long gone. The herd that existed at his demise was purchased with commingled funds and cared for by joint efforts. The record shows that during their marriage, Teddy and Charlene treated cattle ranching as a joint effort. The trial court's ruling is not against the clear weight of the evidence.
CERTIORARI PREVIOUSLY GRANTED;
COURT OF CIVIL APPEALS' OPINION VACATED;
ORDER OF THE DISTRICT COURT AFFIRMED
CONCUR: KANE, C.J., ROWE, V.C.J., and KAUGER, WINCHESTER,
EDMONDSON, GURICH and KUEHN, JJ.
CONCUR IN RESULT: DARBY, J.
DISSENT: COMBS, J.
FOOTNOTES
[1] The record contains the transcript of a hearing held April 13, 2021, on Charlene's and Appellant Rash's competing applications to be named administrator of Teddy's estate. While some of that testimony bears relevance here, the court held a hearing on January 11, 2022, specifically taking testimony on the issues before us. Apparently a transcript from the second hearing was prepared, because the parties' briefs refer to it; but it was not designated as part of the appeal record. It is the obligation of the appealing party to present this Court with a record sufficient to determine the issues raised. King v. Sherrill, 1972 OK 65, ¶ 4, 496 P.2d 803, 804. Nevertheless, the relevant facts do not appear to be in dispute.
[2] Beginning July 1, 1985, if any person having title to any estate not otherwise limited by any antenuptial marriage contract dies without disposing of the estate by will, such estate descends and shall be distributed in the following manner:
1. If the decedent leaves a surviving spouse, the share of the estate passing to said spouse is:
d. if there are surviving issue, one or more of whom are not also issue of the surviving spouse:
(1) an undivided one-half (1/2) interest in the property acquired by the joint industry of the husband and wife during coverture, and 
(2) an undivided equal part in the property of the decedent not acquired by the joint industry of the husband and wife during coverture with each of the living children of the decedent and the lawful issue of any deceased child by right of representation... 
84 O.S. § 213(B)(1)(d).
[3] Teddy and Charlene held their titled assets (land, bank accounts, vehicles) in joint tenancy, such that on the death of one tenant, the property immediately became the asset of the other. Charlene initially claimed that the cattle and hay should also be considered as such an asset, with the right of survivorship, which would give her 100% interest in the assets related to the cattle business upon Teddy's death. See Estate of Metz, 2011 OK 26, ¶¶ 8-9, 256 P.3d 45, 49. The trial court rejected that argument, and because Charlene did not appeal that ruling, we express no opinion on it.
[4] Thereafter, the burden would shift to the non-owning party to rebut the presumption. Larman, 1999 OK 83 at ¶ 17.
[5] A spouse is not required to add any particular quantum of time, money, or effort to establish a stake in a marital asset. We have held that "joint industry" means simply "the industry of a husband and wife, each in his or her recognized sphere of marital activity"; to require that each spouse put in exactly the same amount of effort "would be to circumvent and abort the natural and socially contemplated marriage relation." In re Stone's Estate, 1922 OK 128, ¶ 7, 206 P. 246, 248.
[6] Appellants rely on Hardaway, 1994 OK 30, to claim it is Charlene's burden to prove her entitlement to any part of the assets in question here. That reliance is misplaced. Hardaway dealt with titled property, received by one spouse during the marriage, which remained titled in that spouse's name only throughout the marriage. Id. at ¶¶ 1, 3. The property at issue in this case (cattle and hay) was not titled, and Appellants' claim that it merely represented a change in form for property owned before marriage is not supported in any way by Hardaway. In fact, Hardaway undercuts Appellants' argument, since it holds that when property is received by one spouse during the marriage, the burden of proof falls on the party seeking to establish that the asset should be considered separate property. Id. at ¶ 1. See Boyes' Estate v. Boyes, 1939 OK 85, ¶ 22, 87 P.2d 1102 (where property was acquired by deceased and spouse during the marriage, it was the burden of heirs claiming the property was deceased's separate property, or an exchange of his separate property, to prove their contention). See also Marriage of Ballay, 924 S.W.2d 572, 575-76 (Mo.App. 1996) (where husband had maintained an interest in dairy herd since before marriage, cattle born into the herd during the marriage were presumed to be marital property, and it was his burden to prove otherwise). The cattle and hay on hand at Teddy's death were received during the marriage, and they were the product of joint industry and jointly-held funds. Just because one has separate property before marriage does not mean that similar property, existing at his death, should necessarily be considered separate property.
[7] Compare Milde v. Milde, 723 S.W.2d 471, 473 (Mo.App. 1986) (where husband owned stock in his family's incorporated dairy business, the cattle owned by the corporation were not themselves marital assets).

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1939 OK 85, 87 P.2d 1102, 184 Okla. 438, 
BOYES' ESTATE v. BOYES
Discussed

 
1994 OK 30, 872 P.2d 395, 65 OBJ 959, 
In the Matter of the Estate of Hardaway
Discussed at Length

 
2001 OK 37, 26 P.3d 104, 72 OBJ 1190, 
STANDEFER v. STANDEFER
Discussed at Length

 
1936 OK 724, 62 P.2d 1186, 178 Okla. 384, 
In re WAGNER'S ESTATE
Discussed

 
1961 OK 86, 364 P.2d 891, 
MARSHALL v. MARSHALL
Discussed

 
1932 OK 757, 17 P.2d 411, 161 Okla. 94, 
In re PIERCE'S ESTATE. TARMAN Ex'x et al v. PIERCE.
Discussed

 
1922 OK 128, 206 P. 246, 86 Okla. 33, 
In re ESTATE OF STONE
Discussed

 
1923 OK 159, 213 P. 855, 89 Okla. 21, 
REYNOLDS v. PHIPPS
Discussed

 
1995 OK 5, 890 P.2d 925, 66 OBJ 338, 
Thielenhaus v. Thielenhaus
Discussed

 
1972 OK 65, 496 P.2d 803, 
KING v. SHERRILL
Discussed

 
2002 OK 90, 63 P.3d 9, 
IN THE MATTER OF THE ESTATE OF HOLCOMB
Discussed

 
2011 OK 26, 256 P.3d 45, 
IN THE MATTER OF THE ESTATE OF METZ
Discussed

 
1979 OK 24, 591 P.2d 299, 
UMBER v. UMBER
Discussed at Length

 
2020 OK 94, 477 P.3d 1143, 
IN THE MATTER OF THE ESTATE OF FULKS
Discussed

 
2023 OK 12, 529 P.3d 905, 
OWENS v. OWENS
Discussed

 
1999 OK 83, 991 P.2d 536, 70 OBJ 3260, 
Larman v. Larman
Discussed at Length

 
1985 OK 23, 701 P.2d 405, 
Mothershed v. Mothershed
Discussed

Title 84. Wills and Succession

 
Cite
Name
Level

 
84 O.S. 213, 
Intestacy - Descent and Distribution
Discussed

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA